# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT NASHVILLE

### DECEMBER 1999 SESSION



FILED

March 17, 2000

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | |
| | ) | M1998-00073-CCA-R3-CD |
| Appellee, | ) | C.C.A. No. 01C01-9812-CR-00490 |
| | ) | |
| vs. | ) | Davidson County |
| | ) | |
| DEE W. THOMPSON, | ) | Hon. Seth Norman, Judge |
| | ) | |
| Appellant. | ) | (Aggravated Rape - 3 cts.) |
| | ) | |

**FOR THE APPELLANT:**
**DEANNA B. JOHNSON**
Attorney at Law
424 Church St., Ste. 1350
Nashville, TN 37219-2305

**FOR THE APPELLEE:**
**PAUL G. SUMMERS**
Attorney General & Reporter

**MARVIN E. CLEMENTS, JR.**
Asst. Attorney General
425 Fifth Ave. North
2d Floor, Cordell Hull Bldg.
Nashville, TN  37243-0493

**VICTOR S. JOHNSON, III**
District Attorney General

**JOHN C. ZIMMERMAN**
**PAMELA ANDERSON**
Asst. District Attomeys General
Washington Sq., Ste. 500
222 Second Ave. North
Nashville, TN 37201

OPINION FILED:_____

**REVERSED AND REMANDED**

**JAMES CURWOOD WITT, JR., JUDGE**

## OPINION

The defendant, Dee W. Thompson, appeals from his convictions of three counts of aggravated rape. The defendant received his convictions at a Davidson County jury trial. A repeat violent offender, see Tenn. Code Ann. § 40-35-120 (1997), the defendant is presently serving a sentence of life without possibility of parole for his crimes. In this direct appeal, the defendant raises the following issues for our review:[1]

1. Whether the evidence sufficiently supports his convictions.
2. Whether the trial court properly declined to remove a prospective juror for cause.
3. Whether the trial court properly allowed a nurse who did not examine the victim to testify.
4. Whether the trial court properly allowed the state to introduce the victim's medical records.
5. Whether the trial court correctly excluded a police report the defense attempted to offer as evidence.
6. Whether the trial court properly ruled that the defendant's prior convictions would be admissible to impeach the defendant's credibility if he chose to testify.
7. Whether the repeat violent offender statute was properly applied to the defendant.

We have reviewed the record, the briefs of the parties, and the applicable law. We find reversible error and reverse the judgment of the trial court.

In the light most favorable to the state, the evidence at trial demonstrated that the victim came to Nashville on Friday, June 13, 1997 to spend the weekend with a friend. The victim was dropped off at her friend's house by her boyfriend, with whom she had been fighting. Nevertheless, the victim and her boyfriend had engaged in sexual relations that morning or the previous evening.

On Monday morning, June 16, 1997, the victim left her friend's house to check on the house and family of another friend who was in jail. After checking

---

[1]We address the issues in a different order than as presented by the defendant.

on this friend's home and family, the victim set out on foot on the streets of Nashville. While walking, she met up with yet another friend, who invited her to use crack cocaine at the Trinity Inn. Although the victim had successfully completed drug rehabilitation and had been "clean" for seven months, she accepted the invitation. After using crack with this friend, the victim again set out on foot to return to the friend's house with whom she had visited the previous weekend.

After walking about three to four miles, the victim decided to stop by the defendant's house because she was hot, thirsty and tired. She planned to ask the defendant to give her a ride. Along with friends, the victim had visited in the defendant's house in the past to smoke crack; however, she had not been to the house alone or in the past year. She had recently encountered the defendant in a bar and declined his invitation to smoke crack.

When the victim arrived in the area of the defendant's house, she found the defendant working at the garage in front of his house. The defendant agreed to give the victim a ride after his boss left. He told the victim she could wait inside his house until he finished working. The defendant gave the victim a beer to drink while she waited.

Later, the defendant came inside his house and sat down on the couch. While drinking beer, the victim and the defendant discussed the victim's troubles with her boyfriend. Eventually, the victim asked the defendant when he was going to give her a ride. The defendant's demeanor changed, and he demanded that the victim go into the bedroom and remove her clothing. The victim thought the defendant was joking; however, the defendant took a stick with a metal tip from inside the couch and hit the victim across the eye. He then dragged her

3

into the bedroom by her hair and forced her to undress.

The defendant threw the victim onto the bed while screaming and cursing at her. The defendant forced the victim to fellate him, then he penetrated her vaginally and anally. At some point, he gave the victim an ice pack for her eye.

After the defendant completed the assaults, the victim was concerned for her life and devised a plan to escape. She asked the defendant if he would like to get some crack. The defendant agreed, and the two left the house in a vehicle driven by the defendant. When they neared a crack house, the victim jumped out of the defendant's car and ran to a market. When she found the market closed, she approached a young couple in a car, who gave her a ride to another market. At this market, she had an employee call the police.

When the victim took the police to the defendant's house later that evening, they discovered the stick used to accomplish the assault in a corner of the bedroom. There was blood on the sheets of the defendant's bed and a pair of men's underwear. Bloody tissues and condoms were found in a trash can inside the home.

The victim was examined by medical personnel later that evening. A Woods light examination revealed fluorescence in the perianal and perivulval areas and on the victim's underwear. The Woods light causes sperm and semen to fluoresce. The victim was bruised on the outer part of her vagina. The victim was treated for a sexually transmitted disease and a bacterial infection. She was also given precautionary medications for other sexually transmitted diseases and a tetanus shot. A drug test given at the time of this exam was positive for

4

amphetamines, benzodiazopens and cocaine. The victim had taken prescription anti-anxiety medication which would explain one of the first two positive results.

Subsequent testing by the Tennessee Bureau of Investigation of samples taken at the time of the medical examination revealed that the victim had a mixture of DNA from two or more donors in the vaginal sample. One of the contributors was consistent with the victim herself, and the profile for the other contributor was incomplete. Thus, the forensic scientist evaluating the sample could not determine from whom this DNA had come. The rectal sample was a mixture of two or more donors, none of which was the victim. The defendant could not be excluded as a donor of one of the samples in the mixture. The forensic scientist also examined the tissues and the sheets taken from the defendant's home and determined that the blood on those items was consistent with the defendant's own blood.

To counter the state's proof, the defendant called his employer and his girlfriend to contradict the victim's testimony. According to the defendant's employer, the defendant's vehicle left about 15 minutes after the defendant finished work and returned within 30 minutes. The employer never heard any noise from the house that evening. When the employer went inside the defendant's house a few days after the incident, he observed no signs of a struggle. The employer also recalled that the defendant's car may have had something wrong with the front passenger-side door.

The defendant's girlfriend testified that the defendant had cut his thumb, and she had seen blood on the defendant's sheets on the morning of June 16. She claimed the passenger-side door of the defendant's blue station wagon did

not open.  She claimed the defendant called her around 6:00 or 6:30 on Monday evening, June 16, 1997.

The defense also offered a tape of the victim's testimony from the preliminary hearing, in which the victim's testimony was somewhat at odds with her testimony at trial on particular aspects of the events in question.

On this evidence, the jury found the defendant guilty of three counts of aggravated rape.  The trial court thereafter found the defendant to be a repeat violent offender and sentenced him to life without parole.  Following post-trial proceedings in the court below, the defendant brought this appeal.

# I

The first issue is whether the evidence sufficiently supports the defendant's three convictions of aggravated rape.  When a criminal defendant challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 324, 99 S. Ct. 2781, 2791-92 (1979); State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985); Tenn. R. App. P. 13(e).  This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Dykes, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990).

In determining the sufficiency of the evidence, this court should not reweigh or reevaluate the evidence.  State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Questions concerning the credibility of the witnesses, the

**6**

weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Nor may this court substitute its inferences for those drawn by the trier of fact from the evidence. Liakas v. State, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956); Farmer v. State, 574 S.W.2d 49, 51 (Tenn. Crim. App. 1978). On the contrary, this court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. Cabbage, 571 S.W.2d at 835.

In the present case, the defendant's challenge to the sufficiency of the evidence invites this court to revisit the question of the victim's credibility and the inconclusive nature of the DNA evidence. Because the resolution of questions of fact, including witness credibility, is within the province of the jury, we must decline the defendant's invitation. By its verdict, the jury accredited the victim's testimony despite its sometimes inconsistent nature on particular details. Further, the jury had before it evidence that the scientific proof was not absolute and that it only failed to exclude the defendant as a donor. Viewed in the light most favorable to the state, the evidence establishes beyond a reasonable doubt that the defendant committed three aggravated rapes of the victim. Accordingly, this issue is without merit.

II

The defendant also claims that the trial court improperly declined to remove a prospective juror for cause. In his appellate brief, the defendant has failed to cite any authority to support his position. Thus, the issue has been waived. See Tenn. R. Ct. Crim. App. 10(b); Tenn. R. App. P. 27(a)(7).

Additionally, Tennessee law requires that before a defendant will be

7

heard to complain that a trial court has abused its discretion in failing to remove a potential juror for cause, the defendant must have exercised a peremptory challenge to remove the potential juror, must have exhausted all his peremptory challenges, and must have been forced to accept an incompetent juror. State v. Howell, 868 S.W.2d 238, 288 (Tenn. 1993). In the case at bar, the record reflects that the prospective juror in question was excused by peremptory challenge, but the record does not reflect which party exercised the challenge. Furthermore, the record does not reflect whether the defendant exercised all of his peremptory challenges. As the appellant, the defendant has the burden to present this court with a record which conveys "a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal." Tenn. R. App. P. 24(b). Without a proper record, we are precluded from considering the affected issue. See, e.g., State v. Gibson, 973 S.W.2d 231, 244 (Tenn. Crim. App. 1997), perm. app. denied (Tenn. 1998). Accordingly, the issue is waived on this basis, as well.

### III

The defendant's next complaint is that the trial court erroneously allowed the testimony of a nurse who did not examine the victim to testify about the examination performed by another medical professional. He claims the nurse's testimony from the records of the examination was hearsay. Further, he makes a very general argument that he was deprived of his right to confront a witness against him by the state's failure to call the examining nurse.

Nurse Sandra Myers testified at trial that the victim was examined by Nurse Holly Martin. Nurse Martin prepared a record of the examination; however, since the time of the examination Nurse Martin had moved to California and had not left a forwarding address. The record of the examination was kept in the ordinary

**8**

course of business at the medical facility where Nurse Myers worked and Nurse Martin had previously worked. During Nurse Myers' testimony, the defense interposed an objection to Nurse Myers' testimony about Nurse Martin's qualifications, but there was no objection to Nurse Myers' testimony about the substance of the report.

This court is extremely hesitant to put a trial court in error where its alleged shortcoming has not been the subject of a contemporaneous objection. Indeed, we are not required to grant relief to "a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." Tenn. R. App. P. 36(a). By failing to make a contemporaneous objection to the substance of Nurse Myers' testimony, the defendant has waived appellate consideration of the issue. See, e.g., State v. Gilmore, 823 S.W.2d 566, 570 (Tenn. Crim. App. 1991).

## IV

In a related issue, the defendant complains that the trial court improperly allowed the state to introduce the victim's medical records generated by Nurse Martin as an exhibit to the testimony of Nurse Myers. As with issue III, however, the defendant registered no objection to the admission of these records at trial, thereby failing to take reasonable action to prevent or nullify the alleged harmful effect of the evidentiary admission. See Tenn. R. App. P. 36(a). Appellate review is waived. See Gilmore, 823 S.W.2d at 570.

## V

Next, we are called upon to consider whether the trial court correctly excluded a police report the defense attempted to offer as proof when a police

officer testified in a manner which might be construed to be at odds with the report. At trial, the defense attempted to enter the police report as a "record of regularly conducted activity." See Tenn. R. Evid. 803(6). The trial court ruled the report was not admissible but the defense could cross-examine the officer from it. On appeal, the defendant claims the report is admissible as a "recorded recollection" under Rule 803(5), as well.[2]

In his appellate brief, the defendant makes only a cursory allegation that the report was admissible under Rules 803(5) and 803(6). He has included no citation to decisional authority or substantive discussion of how the report falls within these exceptions to the hearsay rule. Significantly, he makes no acknowledgment of the general inadmissibility of police reports or attempt to explain how this report falls outside the general rule of exclusion. See, e.g., McDonald v. Onoh, 772 S.W.2d 913, 914 (Tenn. Ct. App. 1989); Tenn. R. Evid. 803(8). Our review of this issue has been waived. See Tenn. R. Ct. Crim. App. 10(b); Tenn. R. App. P. 27(a)(7).

## VI

The defendant also alleges that the trial court erred in ruling that if the defendant chose to testify, his prior convictions of first degree murder, escape, aggravated assault and voluntary manslaughter would be admissible to impeach his credibility. Following this ruling, the defendant did not take the stand.

Subject to certain conditions for admissibility, Tennessee Rule of Evidence 609 authorizes the use of proof of a witness's prior convictions in order

---

[2]In his brief, the defendant claims his argument for admission at trial was premised upon Rule 803(5). The record does not bear out this assertion.

to attack a witness's credibility. Tenn. R. Evid. 609(a). The prior conviction must be for a felony or a crime involving dishonesty or false statement. Tenn. R. Evid. 609(a)(2). To be *eligible* as an impeaching conviction, a prior *felony* conviction need not involve dishonesty. However, when the witness to be impeached is the criminal defendant, the state must give notice prior to trial of its intent to utilize the conviction for impeachment purposes, Tenn. R. Evid. 609(a)(3), and upon request, the court must determine the admissibility of an eligible conviction by deciding whether "the conviction's probative value on credibility outweighs its unfair prejudicial effect on the substantive issues." Id. In making this determination, "two criteria are especially relevant." State v. Mixon, 983 S.W.2d 661, 674 (Tenn. 1999). First, the court must "analyze the relevance the impeaching conviction has to the issue of credibility" and "explain [the relevance] on the record," id., and second, it must, "assess the similarity between the crime on trial and the crime underlying the impeaching conviction." Id. (quoting Cohen, Sheppeard, Paine, *Tennessee Law of Evidence* § 609.9 at 376 (3d ed. 1995)).

If the conviction is remote, that is, if more than ten years have elapsed from the date of release from confinement or from the date of conviction if no confinement was involved, the prior conviction is generally not admissible to impeach the conviction. Tenn. R. Evid. 609(b). However, a remote conviction may be admissible where the adverse party gives advance notice of intent to use the conviction, and the court determines that in the interests of justice the conviction's probative value is substantially outweighed by its prejudicial effect. Id.

On appellate review, the trial court's rulings on the admissibility of prior convictions for impeachment purposes are subject to reversal only for abuse of discretion. See, e.g., Mixon, 983 S.W.2d at 674.

**11**

In the present case, the defendant's criminal history is somewhat complex. In 1973, he was convicted of first degree murder and sentenced to a term of imprisonment. While incarcerated, he escaped and assaulted law enforcement officers, resulting in a 1981 conviction of escape and three 1982 convictions of aggravated assault. Still incarcerated, he killed another inmate and received a conviction of voluntary manslaughter in 1983. Due to various administrative sentence credits, the defendant was released from the Department of Correction in 1991, and his final sentence expired in 1995. Other than the time during which he escaped, he was continuously incarcerated in the Department of Correction from 1973 until 1991 due to consecutive sentencing. However, during this time, all but the voluntary manslaughter sentences expired prior to his actual release.

Under the evidentiary rules, the state bears a higher burden of establishing the admissibility of convictions over ten years old. Compare Tenn. R. Evid. 609(a)(3) (for conviction less than ten years old, probative value must outweigh unfair prejudicial effect) with Tenn. R. Evid. 609(b) (for conviction more than ten years old, probative value must *substantially* outweigh unfair prejudicial effect). Thus, the question which arises is whether the defendant's release from incarceration is to be measured for each of his crimes by the date in 1991 upon which he was actually released from the Department of Correction, or whether the earlier sentence expiration dates for each of the crimes other than the voluntary manslaughter conviction should be considered the "release from confinement" date, even though the defendant remained in the Department of Correction to serve the next consecutive sentence. Predictably, the defendant argues that the sentence expiration dates should control all but the voluntary manslaughter sentence, while the state argues that the 1991 date upon which the defendant actually left the

**12**

Department of Correction is controlling for all of the convictions.

In State v. Morgan, 541 S.W.2d 385 (Tenn. 1976), a pre-Tennessee Rules of Evidence case, the supreme court adopted Federal Rule of Evidence 609 as the standard for witness impeachment with prior convictions. Federal Rule 609 as adopted in Morgan provided in pertinent part, "Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness *from the confinement imposed for that conviction* . . . ." Morgan, 541 S.W.2d at 389 (quoting Fed. R. Evid. 609(b)) (emphasis added).

On its face, Rule 609 does not answer the question at issue and merely provides in pertinent part, "Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed between the date of release from confinement and commencement of the action or prosecution . . . ." Tenn. R. Evid. 609(b). No reference is made to "release . . . from the confinement imposed for" the impeaching conviction. See Morgan, 541 S.W.2d at 389. That deletion, if unexplained, would suggest a departure from Morgan. However, the Advisory Commission Comments provide, "Part (b) of proposed Rule 609 restates and hopefully clarifies *Morgan* language concerning the inadmissibility of stale convictions."

Despite the facial ambiguity of Tennessee Rule 609, we find guidance in the Advisory Commission Comments' declaration of new Rule 609(b)'s purpose as "restat[ing] and hopefully clarif[ying]" the prior law of Morgan, rather than changing its result. Further, we believe that at least in the case of multiple, consecutive sentences that are not simultaneously imposed, an evaluation of

"release from confinement" based upon sentence expiration dates is more consistent with Morgan's language, and thereby current Rule 609(b) via the Advisory Commission Comments, than an evaluation which focuses only on the date the defendant is allowed to leave the incarcerative facility at the end of his final sentence.

An analysis which focuses upon the confinement period for the impeaching conviction links the prescribed ten year period to the appropriate conviction and will generally be applicable in any eventual fact situation. On the other hand, basing the calculation on the last day of continual, aggregate confinement could be hard to apply in certain hypotheses, such as when the last confinement is for a misdemeanor that is served through work release, furlough, or other rehabilitative programs or when multiple sentences are served in different jurisdictions via a "hold" and the transfer time is difficult to characterize.

Applying the former approach to the case at bar, the defendant has one conviction which falls within the ten-year range. In order for this conviction of voluntary manslaughter to have been admissible, the state bore the burden of demonstrating that the conviction's probative value on credibility outweighed its unfair prejudicial effect on the substantive issues. See Tenn. R. Evid. 609(a)(3). The defendant's conviction of voluntary manslaughter implicates a crime of violence. "[F]elonies of a violent nature reflect on the moral character of a witness[, and] . . . this evidence is not usually without probative value." State v. Blanton, 926 S.W.2d 953, 960 (Tenn. Crim. App. 1996) (quoting State v. Daniel Strong, No. 88-82-III (Tenn. Crim. App., Nashville, Apr. 12, 1989), perm. app. denied (Tenn. 1989)). But see Long v. State, 607 S.W.2d 482, 485-86 (Tenn. Crim. App. 1980) (violent or assaultive crimes may result from causes which have "little or no direct bearing

**14**

on honesty or veracity"), perm. app. denied (Tenn. 1980). Moreover, the crimes of aggravated rape and voluntary manslaughter are not so similar that the trial court abused its discretion in ruling that evidence of the latter would be evidence in the former. See Mixon, 983 S.W.2d at 674-75. As such, we see no abuse of discretion in the trial court's ruling. Cf. State v. Wiggins, 729 S.W.2d 291, 294-95 (Tenn. Crim. App. 1987) (trial court did not abuse discretion in ruling that probative value of defendant's prior convictions of voluntary manslaughter and possession of marijuana for sale outweighed prejudicial effect in prosecution for aggravated rape and aggravated kidnapping), perm. app. denied (Tenn. 1987). But cf. State v. Farmer, 841 S.W.2d 837, 840 (Tenn. Crim. App. 1992) (probative value of attempted voluntary manslaughter conviction is slight or nonexistent).

The defendant's sentences for the remaining convictions of first degree murder, escape and three counts of aggravated assault all expired more than ten years prior to the commencement of this prosecution. Accordingly, they were only admissible if, based upon specific facts and circumstances, their probative value *substantially* outweighed their prejudicial effect. See Tenn. R. Evid. 609(b).

With respect to the crime of escape, this court has upheld a trial court's determination that this crime is probative of credibility because it involves intent to purposefully violate the law. State v. Ratliff, 673 S.W.2d 884, 885 (Tenn. Crim. App. 1984). Furthermore, the crime of escape bears no similarity to the crime of aggravated rape. We hold that the trial court did not abuse its discretion in allowing for the impeachment use of the escape conviction, even though that conviction's sentence expired outside the ten-year period.

**15**

Aggravated assault and first degree murder are obviously crimes of a violent nature, and as noted above, "felonies of a violent nature reflect on the moral character of a witness[, and] . . . this evidence is not usually without probative value." Blanton, 926 S.W.2d at 960. In Blanton, the court held that a trial court, acting pursuant to Rule 609(a)(3), did not abuse its discretion in allowing the use of a second degree murder conviction to impeach the defendant-witness in an aggravated sexual battery prosecution, even though the child victim was choked to the point of being bruised on her neck. Id. As such, Blanton supports the use of Thompson's prior murder conviction, if not his aggravated assault convictions, had the trial court been properly engaged in a 609(a)(3) analysis.

However, as we have determined, the proper analysis of the murder and aggravated assault convictions emanates from Rule 609(b), which requires that the probative value of the impeaching conviction *substantially* outweighs its prejudicial effect. Using this heightened standard, first we note that, although crimes of extreme violence have been linked to "moral character" and hence to credibility, see Blanton, 926 S.W. 2d at 960, the linkage is not as palpable as when the impeaching crime involves deceit or dishonesty. See, e.g., State v. Caruthers, 676 S.W.2d 935, 941 (Tenn. 1984) (approving impeachment with convictions "over ten years old" of robbery and transporting stolen vehicle in interstate commerce, crimes that have "been found to involve dishonesty or false statement"). Second, in assessing the *degree* by which the probative value outweighs prejudice, we must observe that, although murder and aggravated assault are not the same crimes as aggravated rape, in the present case the proof of aggravated rapes included the victim's narrative of the rapes being preceded, if not accomplished by, the defendant's committing an aggravated assault by viciously striking the victim with a metal-sleeved stick. Pictures of the resulting wound show severe bruising in and

**16**

around the victim's eye. There is obviously a behavioral nexus between such an assault and the type of actions generally proscribed by the homicide and aggravated assault statutes. We cannot say that the probative value as to the credibility of those prior convictions substantially outweighs the prejudicial effect. Nor can we say that the proper use of the escape and voluntary manslaughter convictions attenuates the prejudice to be effected by using the murder and aggravated assault convictions. In other words, the possibility is strong that a jury would assume that, because the defendant committed first degree murder and three aggravated assaults, he harbored the violent propensity necessary to commit the assault and the rapes in the present case. Under the facts of this case, the approval of the use of the first degree murder and aggravated assault convictions was error.

Nor can we say that such error was harmless. In assessing the harmlessness of the error, we do not consider whether the defendant would have testified but for the erroneous ruling – nor whether he would have declined to testify had the trial court excluded the murder and aggravated assault convictions but correctly allowed impeachment via the escape and manslaughter convictions. See State v. Galmore, 994 S.W.2d 120, 124-25 (Tenn. 1999). Rather, our analysis is limited to whether the erroneous impeachment would have "affected the result of the trial on the merits." Tenn. R. Crim. P. 52(a); see Galmore, 994 S.W.2d at 125.

In assessing the harmfulness of this error in a case in which the defendant did not testify, we are obliged to consider the "theory of the defense" in order to determine whether the erroneous impeachment would have had an impact on the result of the trial. See Galmore, 994 S.W.2d at 125. We glean the defense theory from the arguments of counsel, the presentation of evidence in the

**17**

defendant's case-in-chief, and, when appropriate, from the tenor of cross-examination of state witnesses.

In his opening and final arguments, the defendant primarily focused upon the credibility of the victim.[3]  Indeed, the victim was plagued with credibility demerits.  She admitted prior criminal behavior, including the use of crack cocaine, and various criminal convictions, including theft.  She had been in jail for "the last few months" preceding the trial.  She had lost custody of her two minor children to their respective fathers, and an adult son lived with his grandmother.  Within hours after the rape complaint, she tested "positive" for cocaine, even though she had told one of the investigating officers that, although she had been drinking, she had not used cocaine.  Moreover, some of her trial testimony was at odds with her preliminary hearing testimony.  Also, the state's evidence showed that, in addition to the serious wound to the victim's face and eye, she had various contusions which were not fresh.  Additionally, despite her testimony that, as of the time of the rape, she had bathed since engaging in sexual relations with her boyfriend three days before and had not engaged in any other sexual activity before the rape occurred, and although chemical analysis of vaginal and rectal swabs revealed that seminal material found in the rectal area included the defendant as a possible donor, there was also present material from another donor besides the victim.  Based upon these revelations, we conclude that, not only were significant questions raised about the victim's veracity in general, but in particular the defendant pointed to the victim's credibility in explaining the origin of the facial wound and the qualified claim of sexual abstinence prior to the  rape.  The defendant argued that the proof was compatible with the victim being assaulted and injured during a sexual encounter

---

[3]Counsel argued, for example, "Now, this case will come down to a huge extent to credibility," and the victim's "credibility is what it comes down to."

**18**

with another person. Also, during cross-examination, defense counsel asked the victim if she had told the defendant that she received the face-eye injury during a mugging earlier in the day.[4] From these indicia, the theory of the defense is clear: the victim is not credible, and the physical evidence of the injury and sexual activity is as suggestive of actions by a third party as it is of the defendant's guilt.

In Galmore, our supreme court ruled that a defendant need not proffer his would-be testimony in order to successfully appeal a Rule 609 determination, although it acknowledged that in some cases the proffer would be practically necessary in order to establish that a Rule 609 error was harmful. Galmore, 994 S.W.2d at 124-125. In the present case, the theory of the defense is cogent, even in the absence of the defendant's proffered testimony. He has, in effect, proffered the theory of his defense without articulating it from his own mouth. The requirement of a proffer in the present case seems a formality.

In Mixon, the supreme court taught that Rule 609 errors in cases that turn upon credibility have more prejudicial impact than in other cases. See Mixon, 983 S.W.2d at 675. The court refused to find harmless the error of using a sexual battery conviction to impeach Mixon as a witness in a sex offense trial when the victim and the accused were the only witnesses to the alleged sexual offense and the testimony of one conflicted with the other. Id.[5] The present case is another "he said, she said" situation; yet, the victim's narrative of the crime was essentially uncontroverted because the only other person allegedly present did not testify. Had he testified, his own credibility, juxtaposed to hers, would have been crucial, and the

---

[4]The victim denied making this statement.

[5]In Mixon, the defendant testified. Mixon, 983 S.W.3d at 675.

use of the murder and aggravated assault convictions to impeach more likely than not would have affected the result.

Accordingly, the convictions of aggravated rape must be reversed, and the case must be remanded for a new trial.

**VII**

Finally, despite the remand for new trial, we consider whether the repeat violent offender statute was properly applied to the defendant. Thompson claims he is ineligible for a sentence of life without parole under the so-called "three strikes" law because (1) he was not tried within 180 days of arraignment and (2) the state did not file and serve a statement of its intent to seek a sentence of life without parole within 45 days of arraignment.[6] See Tenn. Code Ann. § 40-35-120(i)(1), (2) (1997).

Under the Repeat Violent Offender Statute, offenders convicted of specified violent offenses who have a record of certain proven predicate convictions qualify for an automatic sentence of life without parole, rather than variable sentencing under the usual statutory scheme of offender ranges and offense classes. See Tenn. Code Ann. § 40-35-120 (1997). A charge as a repeat violent offender shall be brought to trial within 180 days of the arraignment, with certain exceptions.[7] Tenn. Code Ann. § 40-35-120(i)(1) (1997). Furthermore, the state is

---

[6]At the sentencing hearing, the defendant conceded that he had the predicate convictions to support sentencing as a repeat violent offender. On appeal, there is no contention to the contrary.

[7]The exceptions are delay caused by (1) the defendant, (2) a competency examination, (3) a competency hearing, (4) an adjudication that the defendant is incompetent to stand trial, (5) a continuance due to the defendant's physical incapacity for trial, or (6) an interlocutory appeal. Tenn. Code Ann. § 40-35-

**20**

required to file with the court and defense counsel a statement that the defendant is a repeat violent offender within 45 days of the arraignment. Tenn. Code Ann. § 40-35-120(i)(2) (1997). If the notice is not timely filed, the defendant shall be granted a continuance so that he has 45 days between the date of notice and the trial. Id. If the state does not comply with the notice provisions, the defendant is not entitled to release from custody or dismissal of the charges. Tenn. Code Ann. § 40-35-120(i)(3) (1997).

In the present case, the defendant was arraigned on the indictment on October 1, 1997. On March 4, 1998, the state filed a "Notice of Enhanced Punishment," citing the defendant's prior convictions of first degree murder, escape, three counts of aggravated assault, and voluntary manslaughter. This notice referenced Code section "40-35-106, et seq." Section 40-35-106 is the provision for Range II "multiple offenders." On June 17, 1998, the state filed its "Notice of Defendant's Status as a Repeat Violent Offender." The certificate of service on this notice reflects service on defense counsel on March 3, 1998; however, at trial the state conceded that the notice was not provided to the defense prior to Friday, June 17, 1998. The defendant's trial commenced the following Monday, June 22, 1998, and his sentencing hearing was conducted on August 12, 1998.

### a. The 45-Day Rule.

In a hearing on the first day of trial, the defense brought the state's untimeliness to the attention of the trial court. The prosecutor acknowledged the untimeliness. He explained that the notice had been prepared some time ago, but it had not been filed with the court because once it was filed the parties were limited

120(i)(1)(A)-(F) (1997).

**21**

in their ability to dispose of the case by plea bargain, see Tenn. Code Ann. § 40-35-120(f) (1997), and there had been hopes of reaching a settlement of the case. The court indicated that the defense could either choose to go forward or have the case continued based upon the untimeliness of the notice. Defense counsel stated her preference, "Well, I'm kind of in a catch twenty-two. My client's been locked up for a year. I don't want a continuance. We're ready to go." Additionally, the trial court declined to strike the notice based upon failure to bring the defendant to trial within 180 days.

The question of whether the state is precluded from seeking a sentence of life without parole when the timeliness provisions of the Repeat Violent Offender Statute are not followed is not addressed in the statute. Moreover, it is one of first impression in the appellate courts. As such, we are guided by our decisions with respect to other statutory requirements of notice in sentencing matters.

In State v. Stephenson, 752 S.W.2d 80 (Tenn. 1988) (Brock, J., dissenting), the supreme court held that the state's failure to file a timely notice of intent to seek enhanced range sentencing did not prevent the trial court from imposing sentence in an enhanced range, absent a demonstration of prejudice to the defendant from the untimely notice. Furthermore, a majority of the Stephenson court held that in the absence of a defense motion for continuance, any objection to the late-filed notice was waived. Id. at 81.

In State v. Adams, 788 S.W.2d 557 (Tenn. 1990), the state's notice of intent to seek enhanced punishment was inadequate and misleading. It stated the enhancement factors the state sought to rely upon at the sentencing hearing,

**22**

but it did not indicate that the state was seeking classification of the defendant as a Range II offender. Id. at 558. The Adams court held that substantial compliance by the state with the notice provision triggered a defendant's duty of inquiry into ambiguous or incomplete aspects of the notice and the requirement that the defendant demonstrate prejudice to obtain relief. Id. at 559; cf. State v. Debro, 787 S.W.2d 932, 933-34 (Tenn. Crim. App. 1989) (defendant must show prejudice in order to obtain relief from sentencing notice which is content-defective). However, the state bears the burden of asserting a defendant's correct sentencing status and may not shift the burden by filing an "empty notice." Id. The court in Adams found the notice both inadequate and misleading; therefore, it reversed the trial court's application of Range II sentencing and remanded for a new sentencing determination. Id.

In State v. Hines, 919 S.W.2d 573 (Tenn. 1995), the defendant came before the trial court for jury resentencing in a death penalty case. The state was untimely in filing its notice of aggravating circumstances prior to the resentencing hearing. Id. at 579. However, the state had previously filed a notice listing the same aggravating circumstances before the original sentencing hearing. Id. The supreme court held that had the untimely notice been the only one filed, the defense would have been entitled to a continuance of the resentencing hearing. Id. However, the need for a continuance was obviated by the previously filed notice listing the same aggravating circumstances upon which the death penalty was sought. Id. Further, the court held that a continuance was not warranted in the absence of a showing of prejudice. Id.

A common thread in each of these cases is the focus on whether the defendant has been prejudiced by the state's defective or delayed notice. In each

**23**

case cited above, the applicable rule mandates that the state "shall" give notice in a prescribed manner. See Tenn. R. Crim. P. 12.3(a), (b); cf. Tenn. Code Ann. § 40-35-202(a) (1997).[8] Likewise, in the case at bar, Code section 40-35-120(i) dictates that the state "shall" give notice and bring the defendant to trial within a specified period of time. The remedy for untimely notice is the option of a continuance for the defense, not preclusion of the state from seeking enhanced sentencing. Compare Tenn. R. Crim. P. 12.3(a), (b) with Tenn. Code Ann. § 40-35-120(i)(2) (1997).

In the present case, the defendant has articulated no prejudice which befell him as a result of the state's untimely compliance with the notice requirement. To be sure, it appears that the delay was of potential benefit to the defendant, as the parties were pursuing the option of a plea agreement, which would be foreclosed or at least limited by a timely filed notice. See Tenn. Code Ann. § 40-35-120(f) (1997) (prohibiting court from accepting plea agreement which fails to recommend that a defendant with appropriate prior record be sentenced as a repeat violent offender unless the indictment is amended to designate a non-violent offense). Further, the defendant had the opportunity to receive a continuance so that he would have more time to prepare following the state's untimely notice; however, he elected not to avail himself of that alternative. We conclude that the state was not foreclosed from seeking sentencing as a repeat violent offender even though it failed to give notice of its intent to do so at least 45 days prior to trial.

### b. The 180-Day Rule.

The cases discussed above do not address a rule which requires the

---

[8]We acknowledge that Stephenson and Adams were decided under the pre-1989 sentencing law. However, as we observed in State v. Gilmore, 823 S.W.2d 566, 570-71 (Tenn. Crim. App. 1991), the current statute is in accord with Rule of Criminal Procedure 12.3 and Stephenson.

defendant be brought to trial within 180 days of arraignment. However, the Repeat Violent Offender Statute provides insight. Although the statute says the defendant "shall" be brought to trial within this time, it enumerates six exceptions. It goes on to provide, "A continuance may be granted to any party, including the court, for good cause shown." Tenn. Code Ann. § 40-35-120(i) (1997).

Our analysis of this issue is directed by our supreme court's treatment of a provision contained in the effectively-repealed Class X Felonies Act of 1979 which is similar in purpose and effect to the repeat violent offender statute. See Tenn. Code Ann. § 40-18-103 (1997); see also Tenn. Code Ann. § 40-18-103 Code Comm'n Notes ("The Sentencing Reform Act of 1989 in effect repealed the Class X Felonies Act of 1979."); Tenn. Code Ann. § 40-35-105(a)(1997) (providing for comprehensive classification of felony offenders under Sentencing Reform Act of 1989); Tenn. Code Ann. § 40-35-110(a)(1997) (providing for comprehensive classification of felony offenses under Sentencing Reform Act of 1989). The Class X Felonies Act contained a provision that a Class X charge "shall be tried within [150] days following arraignment unless delay is occasioned" by the same enumerated circumstances which serve as exceptions to the 180-day requirement set forth in Code section 40-35-120(i). Compare Tenn. Code Ann. § 40-18-103(a) (1997) with Tenn. Code Ann. § 40-35-120(i)(1997). In addition to featuring the same enumerated circumstances which may cause a delay beyond the prescribed deadlines, both sections provide generally for an order of continuance. The continuance may be granted upon demonstrating "a manifest injustice" in the case of section 40-18-103(b), or "good cause shown" in the case of section 40-35-120. Compare Tenn. Code Ann. § 40-18-103(b) with Tenn. Code Ann. § 40-35-120(i). Both statutes provide that a "failure to comply [with the applicable requirements does not] require release of [the accused] from custody or a dismissal [of pending

**25**

charges]." <u>Compare</u> Tenn. Code Ann. § 40-18-103(e) (1997) <u>with</u> Tenn. Code Ann. § 40-35-120(i)(3) (1997). We conclude that the similarities in the two statutes bespeak a common purpose or policy basis.

Our supreme court has commented upon the purpose of the 150-day deadline in the Class X felony law. In <u>State v Wilcoxson</u>, 772 S.W.2d 33 (Tenn. 1989), the court said, "[T]he criteria in [section 40-18-103(a), (b)] are not to be confused with the right [to a speedy trial] reserved to a criminal defendant under the constitution." <u>Id</u>. at 36. The court explained that the 150-day rule was not intended "to benefit a defendant," but merely deemed as serious a class of offenses with respect to which society could be assured of "swift and certain punishment." <u>Id</u>. By analogy, we conclude that the <u>Wilcoxson</u> reasoning applies to the 180-day requirement of section 40-35-120(i). Constitutional provisions for speedy trial and due process are sufficient to protect the interests of defendants in seeing that criminal proceedings are expedited.

Even though none of the enumerated exceptions to the 180-day requirement applied and no order of continuance was sought or granted, the defendant is entitled to no relief. Moreover, he has demonstrated no prejudice from the failure to grant a continuance. Even though the granting of a continuance is committed to the sound discretion of the trial judge, <u>see, e.g.</u>, <u>State v. Strouth</u>, 620 S.W.2d 467, 472 (Tenn. 1981), no request for a continuance appears in the record, and the trial court cannot be viewed to abuse its discretion when it never was called upon to rule on the issue. According, the defendant's claim fails.

The judgment of the trial court is reversed, and the case is remanded for a new trial.

_____
JAMES CURWOOD WITT, JR., JUDGE


CONCUR:


_____
JOE G. RILEY, JUDGE


_____
ALAN E. GLENN, JUDGE