# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### August 30, 2011 Session

## STATE OF TENNESSEE v. WINFORD MCLEAN

**Appeal from the Criminal Court for Bradley County**
**No. 08-23     Amy A. Reedy, Judge**

**No. E2010-02579-CCA-R3-CD - Filed October 28, 2011**

A Bradley County Criminal Court jury convicted the defendant, Winford McLean, of one count of facilitation of possession with intent to deliver 300 grams or more of cocaine. *See* T.C.A. § 39-17-417 and §39-11-403(2006). He was sentenced as a Range II multiple offender to fifteen years in prison. The defendant filed a pretrial motion to suppress evidence, which the trial court denied following an evidentiary hearing. On appeal, he argues that the trial court erred by denying his motion to suppress and by admitting evidence of his prior convictions for use as impeachment at trial. Discerning no error, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and JOHN EVERETT WILLIAMS, J., joined.

Randy R. Rogers, Athens, Tennessee, for the appellant, Winford McLean.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; R. Steven Bebb, District Attorney General; Paul Moyle and Dallas Scott, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

Tenth Judicial District Drug Task Force Agent Matt Bales testified at the pretrial evidentiary hearing that on April 25, 2007, at approximately 11:00 p.m. he was parked in the median of Interstate 75 near mile-marker 25 in Bradley County conducting routine task force operations, which consisted of parking perpendicularly to the northbound traffic lane and shining his headlights and a spotlight at a 45 degree angle toward vehicles traveling northbound on the interstate. As one driver passed, Agent Bales noticed that the

driver "had a startled look on her face and pulled herself forward and looked behind her as she passed." Although the driver "passed below the speed limit," Agent Bales pulled out to catch up to the vehicle. Agent Bales said that he only saw the driver's reaction for "a second, maybe two seconds" before deciding to follow the vehicle. As he approached the vehicle, Agent Bales noticed that the renewal tag on the Georgia license plate was obscured so that he "couldn't clearly see the expiration" date of the tag. At mile-marker 28, Agent Bales "initiated a traffic stop."

As Agent Bales approached the right side of the vehicle, he noticed a man, later identified as the defendant, "laid flat back in the [passenger] seat" who "appeared like he was sleeping." He asked the driver, Nicole Harris, for her license and registration. Agent Bales described Ms. Harris as "nervous in her hand movements" and said that her "hands were jittery" as she handed Agent Bales her driver's license. The defendant, who Agent Bales described as "standoffish" and "guarded," told Agent Bales that the car was his, so Agent Bales asked the defendant to step out so that he could show the defendant that the renewal tag was obscured by the dealer frame surrounding the license plate.[1]

Agent Bales "ran checks" and confirmed that both the defendant and Ms. Harris had valid driver's licenses and no outstanding warrants. His investigation also revealed that the vehicle was not stolen. Nevertheless, Agent Bales contacted his supervisor, Lieutenant Bobby Queen, to "back [him] up." He asked the defendant whether the vehicle contained any guns, drugs, or money. The defendant replied, "No." Agent Bales then asked the defendant for consent to search the vehicle and the defendant said, "Go ahead."

A search of Ms. Harris' purse uncovered a red pouch containing marijuana residue. Inside the trunk of the car, Agent Bales discovered a Nabisco cracker box, taped shut with packing tape, which contained over 400 grams of cocaine. The search of the glove compartment revealed the proper registration documents for the vehicle. Agent Bales said that the defendant never objected to or limited the search of the vehicle in any manner.

On cross-examination, Agent Bales testified that Ms. Harris did not commit any moving violation at any time either during his observation from the median or during his pursuit of the vehicle. Likewise, he admitted that he initially could not see the obstructed renewal tag when he decided to follow the vehicle. He said that Ms. Harris' "reaction to that change in behavior" when he spotlighted her car, which he described as "abnormal," prompted him to follow the vehicle. Once he stopped and approached the vehicle, Agent

---

[1] Agent Bales testified that, initially, the defendant did not produce proper proof of registration because the defendant accidentally handed him registration for another vehicle of similar make and model. Agent Bales later found the proper vehicle registration document during the search of the vehicle.

Bales determined that the renewal tag was up to date. He said that, although the obstructed license plate and failure to produce proof of registration were both citable offenses, neither the defendant nor Ms. Harris had committed any offense warranting placing them under arrest prior to the discovery of the cocaine. Agent Bales testified that 17 minutes elapsed while he completed "all [his] checks." One inquiry to "'Brock Hide'" alerted Agent Bales that the defendant was a "known drug violator." Agent Bales said, "I did suspect there was something wrong and so that's why I did ask for a consent to search." He admitted, however, that although "something didn't seem right and something seemed awry," Ms. Harris and the defendant's behavior could have been caused by "a multitude of things."

The trial court denied the defendant's motion to suppress, ruling that Agent Bales stopped the vehicle based upon his reasonable suspicion that laws concerning an obstructed license plate had been violated. The trial court also ruled that "the stop was not any longer than was necessary to run information and determine the driver was in possession of the valid registration" and that the warrantless search of the vehicle occurred via the defendant's consent.

At trial, Agent Bales testified consistently with his testimony at the evidentiary hearing in most respects. Concerning Ms. Harris' reaction to being spotlighted, he elaborated that she "looked behind [her] and gave [him] the impression that she was expecting someone to pull out behind her." He testified that he did not realize the renewal tag on the vehicle was obscured until "after [he] caught up" to Ms. Harris' vehicle. When asked how many different "checks" he ran, Agent Bales admitted that he ran "close to 12, 13, may[be] 14 checks" on Ms. Harris and the defendant's licenses and histories. On cross-examination, he testified that he stopped the vehicle because he could not see the renewal tag. Upon further questioning, Agent Bales agreed that he did not smell marijuana as he approached the vehicle and that he "just asked" for consent to search. Agent Bales estimated the value of the 1.4 kilos of cocaine recovered from the trunk of the car to be "roughly $25,000."

The jury viewed a video recording taken from Agent Bales's cruiser camera of the entire pursuit, stop, questioning, search, and arrest of the defendant. The video recording reveals that Agent Bales stopped the defendant's vehicle approximately one minute after the pursuit began. Within another minute, Agent Bales requested Ms. Harris' driver's license and registration. When the defendant told Agent Bales that he was in the process of purchasing the car from someone, Agent Bales asked the defendant to step out of the vehicle so that he could show the defendant the obstructed tag. Approximately two and one-half minutes after stopping the vehicle, Agent Bales obtained the defendant's driver's license and asked several questions regarding the defendant's destination, home address, and employment.

Approximately two minutes later, Agent Bales directed the defendant to return to the defendant's car for the defendant's safety, and Agent Bales returned to his cruiser to run checks on the driver's licenses and registration. Agent Bales returned to the defendant's vehicle after running checks for approximately 17 minutes. He asked the defendant to step out of the vehicle, and Agent Bales then conducted a pat-down frisk of the defendant. He informed the defendant that the registration the defendant had provided was for a different vehicle but that the ownership of the vehicle had "checked out." Agent Bales advised the defendant to make sure he had the proper documents in the future. Agent Bales did not issue any citations for either the obstructed license plate or the failure to provide proof of registration. Agent Bales then asked the defendant if the vehicle contained any weapons, drugs, or large amounts of money, to which the defendant replied in the negative. Next, Agent Bales asked the defendant for consent to search the vehicle, and the defendant consented to the search. In less than one and one-half minutes, Agent Bales and Lieutenant Queen discovered the cocaine in the trunk of the vehicle and arrested both the defendant and Ms. Harris.

Based upon this evidence, the jury convicted the defendant of facilitation of possession with intent to deliver 300 grams or more of cocaine, a Class B felony. The trial court imposed a sentence of 15 years' incarceration as a Range II, multiple offender. The defendant argues on appeal that the stop of his vehicle was not based upon reasonable suspicion and that the eventual consent to search was not sufficiently attenuated from the illegality of the initial stop. He also argues that the trial court erred in allowing for use as impeachment his prior convictions of financial transaction card fraud and forgery. The State contends that Agent Bales had reasonable suspicion to stop the defendant's vehicle and that the consent to search was voluntary. The State also argues that the trial court properly ruled admissible as impeachment evidence the defendant's prior convictions of fraud and forgery.

*Motion to Suppress*

When reviewing a trial court's findings of fact and conclusions of law on a motion to suppress evidence, we are guided by the standard of review set forth in *State v. Odom*, 928 S.W.2d 18 (Tenn. 1996). Under this standard, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." *Id.* at 23. When the trial court does not set forth its findings of fact upon the record of the proceedings, however, the appellate court must decide where the preponderance of the evidence lies. *Fields v. State*, 40 S.W.3d 450, 457 n. 5 (Tenn. 2001). As in all cases on appeal, "[t]he prevailing party in the trial court is afforded the 'strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence.'" *State v. Carter*, 16 S.W.3d 762, 765 (Tenn. 2000) (quoting *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998)). We review the trial court's conclusions of law under a de

novo standard without according any presumption of correctness to those conclusions. *See, e.g.*, *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001); *State v. Crutcher*, 989 S.W.2d 295, 299 (Tenn. 1999).

Because stopping an automobile without a warrant and detaining its occupants unquestionably constitutes a seizure, *Delaware v. Prouse*, 440 U.S. 648, 653 (1979), the State in the present situation carried the burden of demonstrating the applicability of an exception to the warrant requirement, *see, e.g.*, *State v. Cox*, 171 S.W.3d 174, 179 (Tenn. 2005) (temporary detention of an individual during a traffic stop constitutes seizure that implicates the protection of both the state and federal constitutions); *State v. Keith*, 978 S.W.2d at 865 (Tenn. 1998). The authority of a police officer to stop a citizen's vehicle is circumscribed by constitutional constraints. As is germane to the case at hand, police officers are constitutionally permitted to conduct a brief investigatory stop when supported by specific and articulable facts leading to reasonable suspicion that a criminal offense has been or is about to be committed. *Terry v. Ohio*, 392 U.S. 1, 20-23 (1968); *State v. Binette*, 33 S.W.3d 215, 218 (Tenn. 2002). Whether reasonable suspicion existed in a particular case is a fact-intensive, but objective analysis. *State v. Garcia*, 123 S.W.3d 335, 344 (Tenn. 2003). The likelihood of criminal activity required for reasonable suspicion is not as great as that required for probable cause and is "considerably less" than would be needed to satisfy a preponderance of the evidence standard. *United States v. Sokolow*, 490 U.S. 1, 7 (1989). A court must consider the totality of the circumstances in evaluating whether a police officer's reasonable suspicion is supported by specific and articulable facts. *State v. Hord*, 106 S.W.3d 68, 71 (Tenn. Crim. App. 2002). The totality of the circumstances embraces considerations of the public interest served by the seizure, the nature and scope of the intrusion, and the objective facts on which the law enforcement officer relied in light of his experience. *See State v. Pulley*, 863 S.W.2d 29, 34 (Tenn. 1993). The objective facts on which an officer relies may include his or her own observations, information obtained from other officers or agencies, offenders' patterns of operation, and information from informants. *State v. Watkins*, 827 S.W.2d 293, 294 (Tenn. 1992).

Agent Bales decided to pursue the defendant's vehicle based upon what he characterized as Ms. Harris' "abnormal" and "startled" reaction to his surveillance techniques. Soon thereafter, Agent Bales noticed that the renewal tag on the license plate was obscured by the dealer frame. Within two to three miles of initiating the pursuit, Agent Bales stopped the vehicle. Agent Bales's observation of the obscured renewal tag provided reasonable suspicion to stop the vehicle, and he was then in a position to conduct a brief investigation. *See also State v. Berrios*, 235 S.W.3d 99, 105 (Tenn. 2007) (noting that a vehicle stop is constitutionally reasonable "if the police have probable cause to believe a traffic violation has occurred").

-5-

That being said, a reasonable traffic stop can become unreasonable and constitutionally invalid if the time, manner, or scope of the investigation exceeds the proper parameters. *See Florida v. Royer*, 460 U.S. 491, 500 (1983); *State v. Troxell*, 78 S.W.3d 866, 871 (Tenn. 2002); *State v. Simpson*, 968 S.W.2d 776, 783 (Tenn. 1998). That is, the duration of such a stop must be "temporary and last no longer than necessary to effectuate the purpose of the stop." *Troxell*, 78 S.W.3d at 871. Moreover, the officer's conduct during an investigative stop must be "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 20. "[T]he proper inquiry is whether during the detention the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." *Troxell*, 78 S.W.3d at 871.

"[N]o hard-and-fast time limit exists beyond which a [traffic stop] detention is automatically considered too long and, thereby unreasonable." *State v. Justin Paul Bruce*, No. E2004-02325-CCA-R3-CD, slip op. at 7 (Tenn. Crim. App., Knoxville, Aug. 22, 2005); *cf. United States v. Sharpe*, 470 U.S. 675, 685 (1985) ("if an investigative stop continues indefinitely, at some point it can no longer be justified as an investigative stop"). Simply put, a law enforcement officer making a valid traffic stop must not prolong the stop for longer than necessary to process the traffic violation without having some reasonable suspicion of other criminal activity sufficient to warrant prolonging the stop. Likewise, no inflexible constitutional guidelines dictate a law enforcement officer's conduct during a traffic stop. Instead, the inquiry is necessarily factually intensive and overlaid with the State's burden of proof regarding a warrantless search and seizure.

Upon initially approaching the vehicle, Agent Bales asked Ms. Harris for her driver's license. When the defendant claimed ownership of the vehicle, Agent Bales asked the defendant to step out of the vehicle so that he could show the defendant the obstructed license plate. Agent Bales then asked the defendant for his driver's license and registration for the vehicle. This initial questioning lasted less than five minutes. On the facts of the case and in the context of the incremental pieces of information disclosed to him, Agent Bales's questions were reasonable and within the scope of the limited ambit of investigation entrusted to an officer in that situation.

Next, while the defendant remained in his own vehicle, Agent Bales ran record checks of both Ms. Harris and the defendant's driver's licenses, backgrounds, and the vehicle. *But see Berrios* , 235 S.W.3d at 109 (holding officer's placing defendant in squad car while he ran checks exceeded the justified scope of conduct under the circumstances). Although he admittedly made numerous checks, the checks elicited information that both the defendant and Ms. Harris possessed valid driver's licenses, had no outstanding warrants, and that the car was not stolen. One check revealed, however, that the defendant was a "known drug violator." Agent Bales testified that throughout the detention he "suspect[ed] there was

something wrong" based upon Ms. Harris and the defendant's overall nervous demeanor. This court has held that a defendant's demeanor and reputation as a drug offender justified a prolonged detention. *State v. Robert Lee Hammonds*, M2005-01352-CCA-R3-CD (Tenn. Crim. App., Nashville, Nov. 29, 2005). In this case, however, the overall detention – from Agent Bales's stopping the vehicle to his requesting consent to search – lasted 26 minutes, with the record checks accounting for approximately 17 minutes of that time. During that time, it appears that Agent Bales did indeed "diligently pursue[] a means of investigation that was likely to confirm or dispel [his] suspicions." *Troxell*, 78 S.W.3d at 871. As noted in *Berrios*, "[a]fter a traffic violation, a driver can generally expect 'to spend a short period of time answering questions and waiting while the officer checks his license and registration, that he may then be given a citation, but that in the end he most likely will be allowed to continue on his way.'" *Berrios*, 235 S.W.3d at 107 (*citing Berkemer v. McCarty*, 468 U.S. 420, 437(1984)). Therefore, we conclude that the evidence does not preponderate against the trial court's finding that the detention was "not any longer than was necessary to run information."

Agent Bales's suspicions, however, were not dispelled by his investigation. His investigation revealed that the defendant had provided improper proof of registration and was a "known drug violator." Agent Bales's suspicions prompted him to ask the defendant for consent to search. It is well-settled that a search conducted pursuant to a voluntary consent is an exception to the requirement that searches and seizures be conducted pursuant to a warrant. *State v. Bartram*, 925 S.W.2d 227, 230 (Tenn. 1996). That is, although the Fourth Amendment and Article I, section 7 of the Tennessee Constitution condemn unreasonable searches and seizures, they recognize the validity of voluntary cooperation. *Florida v. Bostick*, 501 U.S. 429, 439 (1991); *Schneckloth v. Bustamonte*, 412 U.S. 218, 243 (1973) (holding that "there is nothing constitutionally suspect in a person's voluntarily allowing a search"). The sufficiency and validity of consent depend largely upon the facts and circumstances presented by each particular case. *State v. Jackson*, 889 S.W.2d 219, 221 (Tenn. Crim. App. 1993). To satisfy the constitutional reasonableness standard, the consent must be "'unequivocal, specific, intelligently given, and uncontaminated by duress or coercion.'" *State v. Simpson*, 968 S.W.2d 776, 784 (Tenn. 1998) (quoting *State v. Brown*, 836 S.W.2d 530, 547 (Tenn. 1992)). "The existence of consent and whether it was voluntarily given are questions of fact" involving an examination of the totality of the circumstances in each case. *State v. Ashworth*, 3 S.W.3d 25, 29 (Tenn. Crim. App. 1999); *see State v. McCrary*, 45 S.W.3d 36, 43 (Tenn. Crim. App. 2000).

In this case, Agent Bales testified that based upon the defendant's demeanor and after running the records checks, he "just asked" for consent to search. The defendant told Agent Bales to "[g]o ahead." The video recording reveals no duress or coercion. The video recording, in fact, reflects the defendant's voluntary cooperation. *See Schneckloth*, 412

U.S. at 243. Having already deemed the initial stop legal and the subsequent detention reasonable in duration and scope, we further conclude that the defendant consented freely and voluntarily to the search. The trial court correctly denied the motion to suppress.

*Admission of Convictions*

Next, the defendant argues that the trial court erroneously deemed admissible as impeachment two prior convictions – a 1992 financial transaction card fraud conviction and a 2000 forgery conviction. He contends that the trial court's erroneous ruling precluded his testifying at trial. The State argues that the prior convictions were relevant to credibility and admissible as impeachment.

On June 4, 2010, the State filed a notice of its intention to use the defendant's prior convictions to enhance his sentencing range and as impeachment should the defendant testify at trial. The notice lists a 1987 drug conviction, 1988 robbery conviction, 1992 financial transaction card fraud conviction, 1995 drug conviction, two 1999 drug convictions, and a 2000 forgery conviction. The defendant filed a pretrial motion to exclude the use of the prior convictions, arguing that many of the convictions were over 10 years old.

We review the trial court's determination concerning the admissibility of prior convictions as impeachment via an abuse of discretion standard. *State v. Thompson*, 36 S.W.3d 102, 110 (Tenn. Crim. App. 2000); *State v. Blanton*, 926 S.W.2d 953, 960 (Tenn. Crim. App. 1996).

Tennessee Rule of Evidence 609 allows the use of prior convictions as impeachment to attack a witness's credibility. Tenn. R. Evid. 609(a). The prior conviction must be for a felony or a crime involving dishonesty or a false statement. Tenn. R. Evid. 609(a)(2). When the witness to be impeached is the defendant, the State must give notice prior to trial of its intent to use prior convictions to attack the defendant's credibility. Tenn. R. Evid. 609(a)(3). Upon request, the trial court "must determine that the conviction's probative value on credibility outweighs its unfair prejudicial effect on the substantive issues." Tenn. R. Evid. 609(a)(3). In making this determination, "two criteria are especially relevant." *State v. Mixon*, 983 S.W.2d 661, 674 (Tenn. 1999). "A trial court should (a) 'assess the similarity between the crime on trial and the crime underlying the impeaching conviction' and (b) 'analyze the relevance the impeaching conviction has to the issue of credibility.'" *State v. Farmer*, 841 S.W.2d 837, 839 (Tenn. Crim. App. 1992) (quoting Neil P. Cohen et al., *Tennessee Law of Evidence* § 609.9, at 288 (2d ed.1990)).

If, however, the prior conviction is remote, that is if more than 10 years have elapsed from "the date of release from confinement and commencement of the action or

prosecution," the prior conviction is not admissible unless the State gives proper notice of its intention to use the evidence and "the court determines in the interests of justice that the probative value of the conviction, supported by specific facts and circumstances, substantially outweighs its prejudicial effect." Tenn. R. Evid. 609(b). Thus, "[u]nder the evidentiary rules, the [S]tate bears a higher burden of establishing the admissibility of convictions over ten years old." *Thompson,* 36 S.W.3d at 110 (comparing Tenn. R. Evid. 609(a)(3) (for conviction less than ten years old, probative value must outweigh unfair prejudicial effect) to Tenn. R .Evid. 609(b) (for conviction more than ten years old, probative value must *substantially* outweigh unfair prejudicial effect)).

During a hearing on the morning of trial, the State sought admission of only the robbery, fraud, and forgery convictions. The trial court excluded the robbery conviction because it did not find it "as probative of credibility," but the court deemed admissible the fraud and forgery convictions because they involved "obvious[] dishonesty." Although the trial court noted that the fraud conviction occurred more than ten years ago, the court failed to make any finding that the probative value of the conviction *substantially* outweighed the danger of unfair prejudice. *See* Tenn. R. Evid. 609(b). That being said, we agree with the trial court that both the fraud and forgery convictions involved "obvious dishonesty" and were, therefore, highly probative of the defendant's credibility. We conclude that the trial court's failure to make appropriate findings concerning the danger of unfair prejudice presented by their admission was harmless. Furthermore, we conclude that the trial court did not abuse its discretion by deeming admissible as impeachment evidence the defendant's convictions for fraud and forgery. To the extent that the defendant claims that he was denied his right to testify by the trial court's ruling, having determined the trial court committed no abuse of discretion, it follows that the defendant was not denied his right to testify by the ruling.

*Conclusion*

The evidence does not preponderate against the trial court's ruling concerning the motion to suppress evidence. The trial court did not abuse its discretion by deeming admissible evidence of the defendant's prior convictions as impeachment. Accordingly, the judgment of the trial court is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE