IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs March 19, 2002

## STATE OF TENNESSEE v. JIMMY GENE BLANKENSHIP

**Direct Appeal from the Circuit Court for Rhea County**
**No. 15468     J. Curtis Smith, Judge**

**No. E2001-01372-CCA-R3-CD**
**April 17, 2003**

The Defendant was indicted for driving under the influence, driving on a revoked license, evading arrest, reckless endangerment with a deadly weapon, vehicular assault, and violation of the implied consent law. A Rhea County jury convicted the Defendant of driving under the influence, driving on a revoked license, reckless endangerment with a deadly weapon, and vehicular assault. The trial court merged the DUI and reckless endangerment convictions into the vehicular assault conviction. It sentenced the Defendant to four years for vehicular assault and to six months for driving on a revoked license, to be served concurrently. The trial court ordered that the Defendant serve one year in the county jail, perform one hundred hours of public service, pay $800 in restitution, and imposed a fine of $5,500. The Defendant now appeals, arguing the following issues: (1) whether the trial court properly allowed testimony about the Defendant's erratic driving in Hamilton County; (2) whether the trial court erred by allowing the results of a blood alcohol test into evidence; (3) whether the trial court erred by permitting witnesses to testify about the percentage of alcohol in the samples of blood tested; and (4) whether the trial court properly sentenced the Defendant. Finding no error, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and DAVID H. WELLES, J., joined.

Howard L. Upchurch, Pikeville, Tennessee, for the appellant, Jimmy Gene Blankenship.

Paul G. Summers, Attorney General and Reporter; Elizabeth B. Marney, Assistant Attorney General; James Michael Taylor, District Attorney General; and James W. Pope, III, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## I. FACTUAL BACKGROUND

A. Facts Presented at Trial

Edward Hillian testified that at approximately 11:00 p.m. on October 2, 1999, he and his wife, Paula Shaunte Hillian, were driving on Highway 27 in Rhea County in a 1996 Honda Passport. He testified that Highway 27 consisted of four lanes with a turning lane in the middle. He recalled that just before he entered the city limits of Dayton, the speed limit changed to forty-five miles per hour. Hillian stated that at that point, he saw a new model, dark-colored Dodge Ram pickup truck "that was going in and between lanes, back and forth, driving recklessly." He reported that he was behind the truck traveling in the same direction as the truck. Hillian recalled that the truck was weaving "all the way into the turning lane and back into traffic."

Hillian stated that he wanted to pass the truck, but with other traffic beside him, he was concerned that he would be hit by the truck. He testified that he followed the truck to the Highway 60 intersection, where the truck "came very close to the barrels" on the sides of the road. Hillian recalled that he told his wife to call 911. At that point, he stated that he came upon a red light in front of a Krystal restaurant. Hillian stated that the truck went through the red light, and a county police officer made a u-turn in the parking lot and followed the truck. Hillian followed both vehicles. He stated that the truck was still moving erratically.

Hillian could not recall if the officer activated his blue lights immediately after pulling behind the truck. However, he stated that even after the police officer began following the truck, the truck continued to drive "the same way." Hillian testified that he followed the two vehicles to the Highway 30 junction where the truck had "impact with a vehicle that was coming across the highway." Hillian testified that the truck hit the car on the driver's side door and knocked the car into the median. He stated that there was a traffic light at the junction and that the light was red for the truck. Hillian testified that after the wreck, he got out of his truck and waited to talk to the police. He stated that he saw the officer who had been following the truck get the driver out of the truck and "put him to the ground." He then saw emergency vehicles arrive. He spoke to several officers on the scene and gave a written statement the following day.

On cross-examination, Hillian stated that he did not believe that the truck was speeding. He did not recall seeing any cars drive beside the truck. He also did not recall seeing the truck pass any vehicles or seeing any vehicles pass the truck. Hillian testified that at some point near the intersection of Highway 27 and Highway 60, a vehicle pulled up beside Hillian. He testified that the vehicle was still beside him when they passed the Krystal restaurant and that the vehicle stopped at the accident. Hillian acknowledged that the truck never entered the opposing lane of traffic and did not run any vehicles off of the road. He stated that he could not see into the truck, so he did not know how many people were in the vehicle or what the driver was doing while he was driving.

Eddie Morgan testified that on October 2, 1999, he and his wife, Janice Morgan, were traveling northbound on Highway 27. He stated that while in Hamilton County, about a mile south of the Rhea County line, he observed a truck that was traveling "back and forth in the lane." Morgan testified, "I got around him the first time and then he run up on me, and when he run up on me, I got

out of his way, and then followed him on towards Rhea County, which he was from one side of the road, and I'm talking grass to grass." He stated that he initially passed the truck and then later let the truck pass him. Once in Rhea County, Morgan observed the truck go "from side to side of the road." He stated that the highway consisted of four lanes in Rhea County and that the driver of the truck at times "run plum over in the grass." Morgan testified that he did not call the police immediately because his cell phone did not have reception at the county line. However, he testified that he was eventually able to call the police.

Morgan testified that he followed the vehicle into Dayton and that the truck was weaving from lane to lane "most of the way." He recalled that the vehicles were only traveling at a speed of about fifty-five or sixty miles per hour. Morgan reported that they went through an area of construction in Rhea County and that the driver of the truck "was driving better through the construction than he had up the road." He testified that at some point, a police officer pulled behind the truck, and Morgan followed them both. Morgan testified, "And as we got closer to where the accident happened, he swerved over towards the bridge, but he did not strike it, and then he went on to strike the car." He recalled that the truck almost hit the bridge.

Morgan testified that "from a distance," he saw the truck strike a vehicle. He stated that the traffic light where the accident occurred was red for the truck, but he did not see any brake lights on the truck before it hit the vehicle. Morgan testified that he did not see the truck slow down or stop at the light. He testified that the speed limit in that area was forty-five miles per hour and that the truck was traveling at a speed of approximately fifty or fifty-five miles per hour.

Morgan testified that he stopped at the scene of the accident and saw an officer pull the driver out of the truck. He stated that he waited at the scene until the victim was placed in the ambulance. Morgan identified a photograph of the truck and of the vehicle taken after the accident.

On cross-examination, Morgan testified that he was driving a 1997 Jeep Cherokee on the night of the accident and that he recalled a vehicle driving beside him on that evening. He stated that he thought the vehicle was red and that a man and a woman were in the car. Morgan testified that he did not remember seeing the vehicle when he was beside the Krystal. He reported that the lights on the police car were activated as soon as it pulled behind the truck and remained activated until the accident. Morgan testified that the truck traveled at approximately the same speed the entire time. He stated that the police car was between his vehicle and the accident and that he was not in as good a position as the police officer to see the wreck. However, Morgan stated that he was able to see the back of the truck during the wreck, and he recalled that he never saw brake lights.

Shannon Nichols, a records custodian at the Rhea County Medical Center, testified that she was in possession of the Defendant's medical records from October 2, 1999. She stated that the records were prepared by personnel of the hospital in the ordinary course of the hospital's business at or near the time that the Defendant was in the hospital. Nichols testified that the triage nurse had written the following comments in the Defendant's records: "Neck pain. States nine beers today. States he also had taken some kind of pain pills."

On cross-examination, Nichols acknowledged that on one of the forms in the Defendant's medical records was a section entitled "speech," which had a check mark next to the word "silent." She stated that the records also included an "EDP History" and "Physical Worksheet Trauma" as part of a form called "the T system." She explained that "the T system" is the patient's history and physical examination and the doctor's final diagnosis of the patient. She stated that the first page of the document indicated that the Defendant had a loss of consciousness and that his eyes were not red. Nichols testified that the second page of the document indicated that the Defendant had normal speech and a normal gait and station.

Christine Ann Graves testified that she is a medical lab technician at the Rhea County Medical Center. She stated that according to her records, she drew blood from the Defendant on October 2, 1999. Graves testified that the serum blood contained 194 milligrams per deciliter of alcohol. She opined that if she converted that figure to whole blood, the alcohol content of the blood would be between .165 and .175 percent. On cross-examination, Graves testified that she believed that tests sent from her office to the TBI are generally performed on whole blood.

Rusty Rogers of the Spring City Police Department testified that on October 2, 1999, he was working for the Rhea County Sheriff's Department. He recalled that on that evening, he was with Kenny Cox in a Rhea County Sheriff's Department marked vehicle when he received a dispatch about a possible drunk driver in a green truck. He stated that he was at a traffic light near a Krystal restaurant. He reported that he pulled into the turn lane so that he could turn around, travel to the northbound side of the highway, and watch for the suspect's vehicle. Rogers testified that while he was waiting to turn, a truck matching the description of the possible DUI offender traveled through the red light on the northbound side of the highway. He stated that he turned around, activated his blue lights, and followed the truck.

Rogers testified that the truck never slowed down and that it was driving "all over both sides of the road." He stated that he then turned his siren on, but the truck still did not stop. Rogers recalled that the truck almost hit a concrete bridge. Rogers notified his dispatch that he was going to "back off" the truck and just follow him "because he was so dangerous." He testified that at the next intersection, the truck ran a red light and hit a "gold colored Saturn." He stated that he never saw brake lights on the truck. According to Rogers, "[t]he truck run [sic] up on top of the car, and it went . . . all the way across the intersection." Rogers indicated that he had followed the truck for approximately one mile before the accident occurred.

Rogers testified that he notified his dispatch of the accident and then walked over to the truck. He reported that the driver did not unlock the doors for "probably 30 seconds." Rogers identified the Defendant as the driver of the truck. He reported that the Defendant exited the vehicle "with his hands out" and "was automatically . . . just easing down on the ground." Rogers maintained that he did not throw the Defendant on the ground. He stated that he then handcuffed the Defendant. Rogers reported that he could smell "an odor of what [he] believed to be some kind of intoxicant" and that he was unable to understand what the Defendant was saying because his speech was "very slurred." Rogers testified that there was a cooler in the floorboard of the

Defendant's truck. However, he stated that he did not find any alcoholic beverages in the cooler. He stated that the Defendant had a stamp on his hand that read "Governor's Lounge, Downstairs, Saturday Night." Rogers testified that when Tennessee State Trooper Philip Dunn arrived, he turned the accident scene investigation over to Dunn.

Rogers testified that he later went to the hospital and was present when Trooper Dunn asked the Defendant to take a blood alcohol test. He stated that Dunn read the Defendant the implied consent form, and the Defendant signed the form indicating that he refused to take the test. Regarding the Defendant's sobriety on the night of the accident, Rogers testified that the Defendant's speech was "extremely slurred" and there was "a strong odor of what [Rogers] believe[d] to be an intoxicant about him and about his truck." He stated that the Defendant appeared to be under the influence of an intoxicant.

On cross-examination, Rogers testified that in October 1999, he was an "auxiliary policeman" along with Officer Cox. He estimated that it was over thirty miles from the Governor's Lounge in Chattanooga to Dayton, Tennessee. Rogers testified that he turned his siren off "right after [the Defendant] almost hit the bridge." He acknowledged that he was in pursuit of the truck driven by the Defendant because of the dangerous manner in which he was driving.

Tennessee State Trooper Phillip Dunn testified that he had been a trooper for twelve years and that he investigated the wreck that occurred on October 2, 1999 at the intersection of Highway 30 and Highway 27 in Dayton. Dunn stated that when he arrived at the scene at 11:08 p.m., Officer Rogers and several other officers were already there. He recalled that the vehicles had not yet been moved, the ambulance crew was attending to the victim, and the Defendant was handcuffed and on the ground. Dunn reported that the front of the Dodge pickup truck was "up on the rear of" the Saturn. He stated that there was a cooler in the floorboard of the truck, but he did not find any alcoholic beverages in the cooler. Dunn testified that the Defendant had a stamp on one of his hands that read "Governor's Lounge." He reported that he told the Defendant that he was under arrest, advised him of his rights, investigated the wreck scene, and then went to the hospital.

Dunn testified that he read the Defendant an implied consent form, and the Defendant signed the form indicating that he refused to take the test. He stated that he believed that the Defendant understood what he was saying to him and that he did not have any problems communicating with the Defendant. Dunn testified that he signed the form as the requesting officer and that Officer Rogers signed the form as a witness. He reported that he spoke to the Defendant, and the Defendant stated that he had been at the Governor's Lounge in Chattanooga. According to Dunn, the Defendant said that he had drunk nine beers and that he had taken a pain pill that evening. Dunn testified that the Defendant "had an odor of intoxicant about him" and that he "had obviously been drinking quite a bit." He did not recall the Defendant's speech being slurred. Dunn testified that the Tennessee Department of Safety records indicated that at the time of the accident, the Defendant's driver's license was suspended.

-5-

On cross-examination, Dunn testified that he did not have the Defendant perform field sobriety tests because he had been injured in the accident. He stated that the Defendant did not have a seatbelt on and had apparently been knocked unconscious in the accident.

Kenny Cox testified that he is an auxiliary police officer for the Rhea County Sheriff's Department. He stated that he was on patrol with Officer Rusty Rogers on October 2, 1999 when they received a dispatch. Cox recalled that they were on Highway 27 near Krystal when they saw the vehicle that had been described in the dispatch. He stated that the truck was approaching them from the opposite direction and that it ran the red light. Cox testified that they turned around, got behind the truck, and activated the blue lights. He reported that when the truck did not slow down after about thirty seconds, Officer Rogers activated the siren. Cox stated that the truck was driving "from grass line to grass line" and almost struck a bridge on Highway 27. He testified that he saw a car sitting in the left hand lane at the red light. He stated that the truck did not slow down before hitting the car. Cox acknowledged that if the car had not been at the red light, the truck probably would have run the red light. He testified that the truck was traveling at about fifty or fifty-five miles per hour.

After the accident, Cox immediately went to the victim's car. He stated that a bystander helped pry open the door of the victim's car. According to Cox, the victim "was leaned over gasping for air and she was holding her chest and you could tell that the air bag, I believe it was the air bag had blow[n] up in her face . . . and she didn't look like she could breathe at all and that's why we was [sic] trying to make entry into the vehicle to get her out." Cox testified that he did not have any contact with the driver of the truck.

On cross-examination, Cox acknowledged that he is not a certified officer. He also acknowledged that he could have been mistaken about an air bag being deployed in the victim's car. Cox testified that although the truck did not speed up when the blue lights and siren were activated, the truck did not slow down or stop.

Cara Dulaney testified that she was twenty-three years old at the time of trial. She stated that at the time of the accident, she was enrolled at Bryan College and was working at Pizza Hut as a delivery person. Dulaney recalled that on the evening of October 2, 1999, she was out delivering pizzas. She stated that on her way back to Pizza Hut from a delivery, she stopped in the right lane at a red light at the intersection of Highway 27 and Highway 30. She testified that she saw behind her the Defendant's truck and a police car following the truck. Dulaney reported that by the time she realized that the truck was going to hit her, she did not have time to react. She stated that she was driving a 1993, four-door Saturn.

Dulaney testified that the Defendant knocked her car approximately sixty-nine feet. She stated that when her car stopped, she "slammed back into the seat," and she noticed that the truck's grill was in her back seat. Dulaney testified that she was unable to get out of her car because the door was "jammed." She reported that some civilians "jerked the door open" and helped her out of the car. Dulaney testified that after the accident, her back and head were in pain, and she had a

bruise across her chest from the seat belt. She stated that she "couldn't really breathe," and she could not stand.

Dulaney testified that she was transported by ambulance to the Rhea County Medical Center. She stated that the Defendant was placed in the same ambulance and that during the ride to the hospital, the Defendant said that he "had a heart hurt." Dulaney testified that when they arrived at the hospital, the Defendant asked if he hurt anyone. Dulaney stated that she responded affirmatively that he had hurt her. She testified that the Defendant was intoxicated.

Dulaney testified that at the time of trial, she was still under medical care for her injuries sustained during the accident. She reported that she suffered mainly soft tissue injuries to her back. She also reported that she had bruises on her legs and that her earrings had been ripped out. Dulaney testified that she went to rehabilitation for one month for the soft tissue injury, muscle spasms, and contusions. She recalled that on the night of the accident, she was bleeding from her mouth and ears. Dulaney identified the Defendant as the driver of the truck that hit her.

On cross-examination, Dulaney testified that she was in the right lane and that the truck hit her from behind. She stated that she had not been in the left lane and that she did not come from Highway 30. Dulaney testified that her car had an air bag, but it did not deploy on the night of the accident.

Brett Trotter testified that he is employed by the Tennessee Bureau of Investigation (TBI) in the forensic services division at the Chattanooga Regional Crime Laboratory. He stated that he performs "solid dosage drug analysis" and blood alcohol content determinations. Trotter reviewed a document in court which indicated that the Defendant had a serum blood alcohol level of .194 percent. He stated that serum blood typically tests anywhere from eleven to twenty-three percent higher than whole blood. Thus, he estimated that the Defendant's whole blood alcohol level would be between .157 and .174 percent.

## B. Facts Presented at the Sentencing Hearing

The Defendant testified that he was twenty-five years old at the time of the sentencing hearing and that he was twenty-three years old at the time of the accident. He stated that he lived with his girlfriend, Brandy Barger, in a mobile home in Rhea County that he rented from his mother. The Defendant testified that his girlfriend had been living with him for approximately one year. He stated that he had frequent contact with his mother who lived in Cleveland, Tennessee. The Defendant testified that he worked in construction with his father, Gary Blankenship, who was a brick mason and construction worker. Prior to working with his father, the Defendant performed insulation work for two different employers. He stated that he worked for "HTH" doing insulation work for a plant in Loudon, but he got laid off "due to reduce of force." He further stated that he worked for "GBI" at Dupont for five years. The Defendant testified that the job at Dupont was "slowing down" when he quit.

The Defendant testified that on the day of the offense, he had worked for "GBI." He recalled that after work, he went to a club called Dagwoods and watched a football game while drinking "a beer or two." The Defendant reported that he also drank beer in the morning before he went to work and during his lunch break. He could not recall how many beers he had before he went to Dagwoods. The Defendant testified that after he left Dagwoods, he went to the Governor's Lounge, but he maintained that he did not have anything to drink while there. He stated that after he left the Governor's Lounge, he took a "pain pill" because he had recently had two teeth pulled. The Defendant then drove towards his home in Evansville.

The Defendant could recall only "bits and pieces" of his drive home. He stated that the last thing he remembered was turning off Highway 111 onto Highway 127 near Sale Creek. The Defendant testified that he could not remember anything about the accident other than a brief ride in the ambulance. He stated that he recalled waking up at the hospital when someone was drawing blood from him. The Defendant testified that he had not consumed any alcohol since the date of the accident. He further stated that he quit drinking in an effort to "get [his] fiancee back." The Defendant testified that he did not receive any treatment to stop drinking.

The Defendant testified that he had used marijuana in the past, but that he was not using any drugs at the time of the sentencing hearing. He acknowledged that he did not tell his probation officer, David Shinn, that he had smoked marijuana in the past. The Defendant testified that a civil suit had been filed against him concerning the accident. He admitted his responsibility for the accident.

The Defendant testified that when he was younger, his stepfather had physically abused him and had sexually abused his sister. He reported that his stepfather was convicted for the sexual abuse of his sister. The Defendant testified that the abuse that he and his sister endured caused him to start drinking. Regarding the accident, the Defendant testified, "I feel sick at my stomach and I feel terrible about it . . . because I have endangered somebody else's life." The Defendant testified that immediately after the accident, he tried to contact the victim to apologize.

The Defendant testified that he had not driven since a couple of weeks after the accident. He testified that his girlfriend had been driving him to and from work since the accident. The Defendant acknowledged that at the time of the accident, he had a pending DUI charge in Hamilton County to which he had since pled guilty. He also acknowledged that there was a DUI charge pending against him in Rhea County from 1996. According to the Defendant, the trial court told him that if he completed the "Cadas" program, all charges for the 1996 DUI would be dropped. He testified that he completed the outpatient program at Cadas, but he began to drink again approximately a year and a half or two years later. The Defendant acknowledged that he failed on a couple of occasions to appear in court for the 1996 charges. However, he testified that there was some confusion about the status of the case, and he maintained that since learning in 1999 that the charge was still pending, he had appeared at each scheduled court date.

The Defendant testified that he would be willing to enter some type of alcohol and drug dependency program if he was granted alternative sentencing in this case. He maintained that he would not drive a vehicle while on probation. He also maintained that he would comply with any and all conditions of probation imposed by the trial court.

On cross-examination, the Defendant acknowledged that he had been previously convicted of DUI, driving on a revoked license, and three separate counts of possession of marijuana. He also acknowledged that he had been given some form of probation for each of those convictions. The Defendant testified that he had been served with a show cause order as to why his probation should not be revoked for failure to appear in court for a charge in Hamilton County. He admitted that he was on probation for possession of marijuana when he was arrested a second time for possession of marijuana. He further admitted that while he was on probation for the two possession charges, he was arrested a third time for possession of marijuana. The Defendant stated that "on a couple of occasions" the marijuana belonged to someone else.

The Defendant acknowledged that he gave a statement to his probation officer in which he told him that he watched a football game at a club. The Defendant acknowledged that in the statement, he said "I left[,] went to [the] store[,] got a coke, took some pain pill for [a] tooth ache when on my way home I fell asleep behind the wheel of my truck due to lack of sleep, not alcohol." He maintained that although he had been drinking that night, lack of sleep was the cause of the accident.

On re-direct examination, the Defendant testified that he had not been in trouble since the accident. He stated that he started drinking again in late 1998 or early 1999 because a girlfriend broke up with him on Valentine's Day. The Defendant testified that he "didn't know how else to handle" the breakup.

Brandy Barger, the Defendant's girlfriend, testified that she had lived with the Defendant for the past year. She stated that the Defendant had not had anything to drink since she had been living with him. Barger testified that instead of drinking, the Defendant worked around the house and helped out her stepfather. She reported that she had not seen the Defendant driving a vehicle since she began living with him and that she had been driving him around. Barger stated that the Defendant was remorseful for what happened.

Debra Doughton, the Defendant's mother, testified that she had been around the Defendant on a regular basis since the accident. She stated that there was no indication that the Defendant had had anything to drink since the accident. She further stated that the Defendant had not driven a vehicle since the accident. Doughton testified that the Defendant had expressed remorse about the accident. She noted that since the accident, the Defendant realized the consequences of his actions and quit drinking. Doughton believed that if her son was placed on probation, he would refrain from drinking. She acknowledged that the Defendant's stepfather had been convicted for sexually abusing the Defendant's sister and that the Defendant told her that his stepfather physically abused him. Doughton testified that the Defendant began drinking at the age of fifteen. She stated that she was

willing to help the Defendant refrain from drinking and refrain from driving if he was placed on probation. On cross-examination, Doughton testified that she talked to the Defendant about drinking and that he quit "for awhile." On re-direct examination, Doughton testified that the Defendant began drinking during the period of time that litigation was going on involving the sexual abuse of her daughter.

David Shinn, the Defendant's probation officer, testified that he prepared the presentence report and performed the investigation in the Defendant's case. He stated that the Defendant indicated on a questionnaire that he had graduated from Bledsoe County High School and that the Defendant told Shinn that he had graduated from high school. However, Shinn learned from the Defendant's mother that the Defendant instead got his G.E.D. Shinn reported that the Defendant told him that he had not been drinking on the day of the accident. He also reported that the Defendant denied having a problem with alcohol.

## II. ANALYSIS

### A. Erratic Hamilton County Driving as Character Evidence

The Defendant argues that the trial court erred by allowing a State's witness to testify as to the Defendant's reckless operation of his motor vehicle in Hamilton County. The Defendant argues that such testimony constituted character evidence and thus should not have been allowed. With certain exceptions, Tennessee Rule of Evidence 404(b) prohibits "[e]vidence of other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in conformity with the character trait." The generally recognized exceptions to the rule allow evidence offered to prove motive, identity, intent, absence of mistake, opportunity, or a common scheme or plan. State v. Morris, 24 S.W.3d 788, 810 (Tenn. 2002); Bunch v. State, 605 S.W.2d 227, 229 (Tenn. 1980). Our supreme court has also noted that the "completion of the story" may also be a proper basis for admission of evidence. See Morris, 24 S.W.3d at 810. "If the contextual evidence is relevant to an issue other than criminal propensity and its probative value is not outweighed by the danger of unfair prejudice, then that evidence may be properly admissible." State v. Gilliland, 22 S.W.3d 266, 271 (Tenn. 2000).

At trial, Eddie Morgan testified that he was behind the Defendant's truck on Highway 27 on the night of the accident. He stated that he first saw the truck in Hamilton County about a mile south of the Rhea County line. Morgan continued to follow the truck into Rhea County. He testified that the Defendant was driving erratically the entire time that he was behind him, from Hamilton County into Rhea County.

We conclude that the trial court properly admitted the testimony regarding the Defendant's erratic driving in Hamilton County. Morgan merely provided context for the offense in Rhea County. See Morris, 24 S.W.3d at 810. In addition, driving under the influence is a continuing offense. State v. Corder, 854 S.W.2d 653, 654 (Tenn. Crim. App. 1992). Thus, the Defendant's behavior in Hamilton County was merely part of the same offense. However, even if we were to

conclude that Morgan's testimony constituted character evidence, admission of such evidence by the trial court constituted harmless error. See Tenn. R. Crim. P. 52(a). There was overwhelming evidence presented regarding the Defendant's erratic driving in Rhea County. This issue is without merit.

## B. Blood Alcohol Test

The Defendant argues that the trial court erred by allowing into evidence the results of the Defendant's blood alcohol test. Specifically, the Defendant argues that although he declined to have the blood alcohol test performed and signed an implied consent form to that effect, police officials ordered the test against his will. However, we conclude that the test was ordered by the hospital staff and was therefore admissible.

As a general matter, we note that "[t]he admissibility of evidence is generally within the broad discretion of the trial court . . . [and that] absent an abuse of that discretion, the trial court's decision will not be reversed." State v. Edison, 9 S.W.3d 75, 77 (Tenn. 1999). The trial court, as the trier of fact, is able to assess the credibility of the witnesses, determine the weight and value to be afforded the evidence and resolve any conflicts in the evidence. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). We, therefore, must review this matter under an abuse of discretion standard.

Tennessee Code Annotated § 55-10-406(a)(3) provides that if an offender refuses to take a blood alcohol test, law enforcement shall not administer the test. However, Tennessee Code Annotated § 55-10-406 is not applicable to procedures performed "'pursuant to a medical rather than a law enforcement request.'" State v. Goldston, 29 S.W.3d 537, 540 (Tenn. Crim. App. 1999) (quoting State v. Ridge, 667 S.W. 2d 502, 505 (Tenn. Crim. App. 1982)). Thus, we must determine whether the blood was taken from the Defendant for medical purposes or at the request of law enforcement.

Christine Graves, a medical lab technician, testified that she was working at Rhea Medical Center on the night of October 2, 1999. She stated that on that night, she drew blood from the Defendant, tested the blood, and prepared documents on the testing. Graves could not recall who requested that the Defendant's blood be drawn. She testified that the blood was drawn for medical purposes and that it was not drawn at the request of police officers.

On cross-examination, Graves testified that when blood is drawn, there is a requisition for blood work by a physician. She viewed a copy of a document entitled Emergency Department Physician's Orders in court and stated that it did not show a request for blood work. However, she stated that she did not recognize that document, and she explained that she usually relies on a requisition when drawing blood. Graves testified that she drew the Defendant's blood at 11:55 p.m. She further testified that the document that she prepared showed that the blood work was ordered at 11:57 p.m. Graves stated that the entries on the documents did not necessarily mean that a physician ordered the blood work two minutes after she drew it. Graves stated that when she put the results of the blood test into a computer, the computer automatically faxed the results to the

emergency room. She reported that the only two reasons she would have drawn blood would have been at the request of a physician or at the request of a police officer.

Trooper Phillip Dunn of the highway patrol testified that he investigated the wreck involving the Defendant and that he went to the hospital that evening. He stated that he arrived at the hospital at 12:17 a.m. on October 3, 1999. Dunn maintained that he did not call the hospital to request that blood be drawn from the Defendant. He stated that Officer Rogers also went to the hospital and arrived at about the same time. Dunn testified that he read an implied consent form to the Defendant. He stated that the Defendant signed the implied consent form and refused to take any type of blood test. Dunn maintained that he did not request that blood be drawn from the Defendant and that he did not know of any other officer who requested that blood be drawn from the Defendant.

On cross-examination, Dunn testified that around 11:20 p.m., the Defendant was taken by ambulance from the scene of the accident to the hospital. He stated that he did not arrive at the hospital until 12:17 p.m. Dunn reported that multiple officers from the Dayton City Police Department, the highway patrol, and the Rhea County Sheriff's Department were at the scene of the accident. He stated that when he arrived at the scene, the Defendant was already handcuffed and on the ground. Dunn testified that he was not aware of a deputy sheriff from Rhea County going to the emergency room at 11:50. On re-direct examination, Dunn stated that the only other officers that he recalled being at the hospital were officers Rusty Rogers and Kenny Cox. On re-cross examination, Dunn testified that he thought that Rogers and Cox drove to the hospital in the same vehicle.

Shannon Nichols, the records custodian at the Rhea County Medical Center, brought the Defendant's medical records from October 2-3, 1999 to court. She stated that triage or nurse's notes were included in the records. She stated that the nurses write down "what's happening" in the notes in timed entries. Nichols testified that in the notes, there was a notation indicating that at 11:50 p.m. there was a "lab in with patient Rhea County Sheriff deputy officer's here." Nichols identified a physician's order signed by Dr. Jeffero, and she stated that there were no notes on the document indicating that the doctor had ordered any blood work on the Defendant. Nichols testified that a requisition for blood work was not included in the Defendant's chart.

Christine Graves was recalled to the witness stand. She testified that when an officer requests that a blood alcohol test be done on a patient, there are certain documents that must be signed by the officer. Graves testified that the signed document remains with the blood that is tested, and all paperwork is sent with the blood sample to the TBI.

Rusty Rogers of the Spring City Police Department testified that on October 2, 1999, he was working with the Rhea County Sheriff's Office. He stated that on that evening, he followed the Defendant's truck just before it wrecked. Rogers testified that he went to the hospital that evening

and arrived at approximately the same time as Phillip Dunn. He stated that he did not request that anyone draw blood from the Defendant. Rogers testified that he witnessed the Defendant sign the implied consent form. He recalled that he and Officer Cox rode to the hospital in the same vehicle and that Officer Cox was with him the entire time at the hospital. Rogers testified that he did not recall Officer Cox requesting that anyone draw the Defendant's blood.

On cross-examination, Rogers testified that there were numerous officers at the scene of the accident. He stated that he did not have any records that indicated what time he arrived at the hospital. Rogers could not recall if another officer was at the hospital when he arrived. He stated that he had already placed the Defendant under arrest by the time Dunn arrived at the accident scene.

We conclude that the trial court did not err by allowing the State to introduce the Defendant's blood alcohol test into evidence. In determining that the test was admissible, the trial court stated that it found Officer Dunn's testimony to be credible and that it also found that the testimony by the other officers was credible. All of the officers testified that they did not request that blood be drawn from the Defendant and that they did not witness other officers request that blood be drawn from the Defendant. The trial court noted that Christine Graves testified that a certain procedure is followed when blood work is requested by an officer, and that procedure was not followed with the Defendant. Thus, sufficient evidence was presented at trial to show that the Defendant's blood was drawn by medical personnel and was analyzed by them in connection with their efforts to provide him with medical care.

Furthermore, we conclude that the records were properly admitted into evidence under the business records exception to the hearsay rule.

> A memorandum, report, record, or data compilation in any form of acts, events, conditions, opinions, or diagnoses made at or near the time by or from information transmitted by a person with knowledge and a business duty to record or transmit if kept in the course of a regularly conducted business activity and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes every kind of business, institution, association, profession, occupation, and calling, whether or not conducted for profit.

Tenn. R. Evid. 803(6). Shannon Nichols, the records custodian at the Rhea County Medical Center, testified at trial that the Defendant's medical records were prepared by hospital personnel during the ordinary course of the hospital's business. For these reasons, we conclude that the trial court did not abuse its discretion in admitting the Defendant's blood test results. This issue is without merit.

C. Testimony Regarding Blood Alcohol Content

-13-

The Defendant argues that the trial court erred by allowing witnesses for the State to testify regarding the percentage of alcohol contained in the Defendant's blood that was tested by the Rhea County Medical Center. Specifically, the Defendant contends that the testimony of Christine Graves and Brett Trotter was misleading and allowed the jury to speculate about how the blood alcohol level affected the Defendant. However, defense counsel failed to object to the testimony of Graves or Trotter on the basis that their testimony confused the jury. By failing to make a contemporaneous objection to testimony, a defendant waives appellate consideration of the issue. State v. Thompson, 36 S.W.3d 102, 108 (Tenn. Crim. App. 2000).

Regardless, we find the Defendant's argument without merit. Tennessee Rule of Evidence 403 provides that evidence, although relevant, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." We conclude that the testimony of Christine Graves and Brett Trotter was not misleading and thus properly allowed by the trial court. Graves and Trotter testified regarding the percentage of alcohol in the serum blood. They both acknowledged that test results are usually significantly higher for serum blood than for whole blood. However, they were able to convert the serum blood figures to whole blood figures. Trotter calculated that the Defendant's whole blood alcohol level was between .157 and .174 percent, and Graves calculated the level at between .165 and .175. Both are well above the legal limit.

The Defendant also cites Tennessee Rule of Evidence 702 to support his contention that the results of scientific tests or expert opinions can only be admitted where such evidence will substantially assist the trier of fact to understand the evidence or to determine a fact in issue. Tennessee Rule of Evidence 702 provides:

> If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

We conclude that the testimony did provide the jury with substantial assistance in interpreting the blood alcohol test. As the trial court noted, the blood alcohol evidence was "some proof that [the Defendant] had alcohol in his blood." Furthermore, to the Defendant's advantage, the trial court declined to charge the jury regarding the presumption of impairment contained in Tennessee Code Annotated § 55-10-408(a). We respectfully disagree with the Defendant's argument on appeal that the testimony of Graves and Trotter pertaining to the alcohol content of the Defendant's blood must include opinions as to "how an individual such as the Defendant would be affected by this blood alcohol level." Finally, if any error pertaining to the blood alcohol evidence occurred in this case, it was clearly harmless. See Tenn. R. Crim. P. 52(a). The evidence that the Defendant was driving while intoxicated, without the blood alcohol evidence, was overwhelming in this case. This issue is without merit.

D. Sentencing

-14-

The Defendant argues that the trial court erred in sentencing him. When a criminal defendant challenges the length, range, or manner of service of a sentence, the reviewing court must conduct a <u>de novo</u> review of the sentence with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). This presumption, however, "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." <u>State v. Ashby</u>, 823 S.W.2d 166, 169 (Tenn. 1991). In the event that the record fails to show such consideration, the review of the sentence is purely <u>de novo</u>. <u>State v. Shelton</u>, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992).

In making its sentencing determination, the trial court, at the conclusion of the sentencing hearing, determines the range of sentence and then determines the specific sentence and the propriety of sentencing alternatives by considering (1) the evidence, if any, received at the trial and the sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct involved, (5) evidence and information offered by the parties on the enhancement and mitigating factors, (6) any statements the defendant wishes to make in the defendant's behalf about sentencing, and (7) the potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-210(a), (b), -103(5); <u>State v. Williams</u>, 920 S.W.2d 247, 258 (Tenn. Crim. App. 1995).

The presumptive sentence to be imposed by the trial court for a Class B, C, D or E felony is the minimum within the applicable range unless there are enhancement or mitigating factors present. Tenn. Code Ann. § 40-35-210(c). If there are enhancement or mitigating factors, the court must start at the presumptive sentence, enhance the sentence as appropriate for the enhancement factors, and then reduce the sentence in the range as appropriate for the mitigating factors. <u>Id.</u> § 40-35-210(e). The weight to be given each factor is left to the discretion of the trial judge. <u>Shelton</u>, 854 S.W.2d at 123. However, the sentence must be adequately supported by the record and comply with the purposes and principles of the 1989 Sentencing Reform Act. <u>State v. Moss</u>, 727 S.W.2d 229, 237 (Tenn. 1986).

When imposing a sentence, the trial court must make specific findings of fact on the record supporting the sentence. Tenn. Code Ann. § 40-35-209(c). The record should also include any enhancement or mitigating factors applied by the trial court. <u>Id.</u> § 40-35-210(f). Thus, if the trial court wishes to enhance a sentence, the court must state its reasons on the record. The purpose of recording the court's reasoning is to guarantee the preparation of a proper record for appellate review. <u>State v. Ervin</u>, 939 S.W.2d 581, 584 (Tenn. Crim. App. 1996). Because the record in this case indicates that the trial court adequately considered the enhancement and mitigating factors as well as the underlying facts, our review is <u>de novo</u> with a presumption of correctness.

Enhancement factors must be "appropriate for the offense" and "not themselves essential elements of the offense." Tenn. Code Ann. § 40-35-114.

> The obvious purpose of these limitations is to exclude enhancement factors which are not relevant to the offense and those based on facts which are used to prove the offense. Facts which establish the elements of the offense charged may not also be the basis of an enhancement factor increasing punishment. The legislature, in determining the ranges of punishment within the classifications of offenses, necessarily took into account the culpability inherent in each offense.

State v. Jones, 883 S.W.2d 597, 601 (Tenn. 1994).

If our review reflects that the trial court followed the statutory sentencing procedure, that the court imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing law, and that the trial court's findings of fact are adequately supported by the record, then we may not modify the sentence "even if we would have preferred a different result." State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). The defendant bears the burden of showing the impropriety of the sentence imposed. Ashby, 823 S.W.2d at 169.

Specifically, the Defendant argues that the trial court erred by failing to grant him alternative sentencing. Tennessee Code Annotated § 40-35-102(5) provides as follows:

> In recognition that state prison capacities and the funds to build and maintain them are limited, convicted felons committing the most severe offenses, possessing criminal histories evincing a clear disregard for the laws and morals of society, and evincing failure of past efforts at rehabilitation shall be given first priority regarding sentencing involving incarceration . . . .

A defendant who does not fall within this class of offenders "and who is an especially mitigated offender or standard offender convicted of a Class C, D, or E felony is presumed to be a favorable candidate for alternative sentencing in the absence of evidence to the contrary." Tenn. Code Ann. § 40-35-102(6). Furthermore, unless sufficient evidence rebuts the presumption, "[t]he trial court must presume that a defendant sentenced to eight years or less and not an offender for whom incarceration is a priority is subject to alternative sentencing and that a sentence other than incarceration would result in successful rehabilitation." State v. Byrd, 861 S.W.2d 377, 379-80 (Tenn. Crim. App. 1993); see also Tenn. Code Ann. § 40-35-303(a). The Defendant, as a standard offender convicted of a Class D felony and a Class B misdemeanor, is presumed to be a favorable candidate for alternative sentencing. See Tenn. Code Ann. §§ 39-13-106(b), 55-50-504(a)(1).

However, all offenders who meet the criteria are not entitled to relief; instead, sentencing issues must be determined by the facts and circumstances of each case. See State v. Taylor, 744 S.W.2d 919, 922 (Tenn. Crim. App. 1987) (citing Moss, 727 S.W.2d at 235). Even if a defendant is presumed to be a favorable candidate for alternative sentencing under Tennessee Code Annotated § 40-35-102(6), the statutory presumption of an alternative sentence may be overcome if

(A) [c]onfinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) [c]onfinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) [m]easures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant . . . .

Tenn. Code Ann. § 40-35-103(1)(A)-(C). In choosing among possible sentencing alternatives, the trial court should also consider Tennessee Code Annotated § 40-35-103(5), which states, in pertinent part: "The potential or lack of potential for the rehabilitation or treatment of a defendant should be considered in determining the sentence alternative or length of a term to be imposed." Id. § 40-35-103(5); see also State v. Dowdy, 894 S.W.2d 301, 305 (Tenn. Crim. App. 1994). A court may also consider the mitigating and enhancing factors set forth in Tennessee Code Annotated § 40-35-113 and § 40-35-114 as they are relevant to the § 40-35-103 considerations. Tenn. Code Ann. § 40-35-210(b)(5); State v. Boston, 938 S.W.2d 435, 438 (Tenn. Crim. App. 1996).


In addition to arguing that he should receive alternative sentencing, the Defendant argues that he should have been granted probation. With certain exceptions, a defendant is eligible for probation if the sentence actually imposed is eight years or less. Tenn. Code Ann. § 40-35-303(a). "Although probation 'must be automatically considered as a sentencing option for eligible defendants, the defendant is not automatically entitled to probation as a matter of law.'" State v. Davis, 940 S.W.2d 558, 559 (Tenn. 1997) (quoting Tenn. Code Ann. § 40-35-303(b) (1990), Sentencing Commission Comments). In determining whether to grant or deny probation, the trial court may consider the circumstances of the offense; the defendant's criminal record, background and social history; the defendant's physical and mental health; the deterrent effect on other criminal activity; and the likelihood that probation is in the best interests of both the public and the defendant. State v. Parker, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996). The defendant has the burden of establishing suitability for probation. Tenn. Code Ann. § 40-35-303(b); Ashby, 823 S.W.2d at 169.


In sentencing the Defendant, the trial court stated that it "believed little" of what the Defendant said. It stated that the Defendant presented at least two different accounts of what happened. The court noted that the Defendant "tried to express remorse and worry" on the stand, but later made a comment about other charges for which he said he took the "rap" for others because it was the only way he could get probation. The trial court determined that the Defendant's motivation at sentencing appeared to be more about fear of jail time than actual remorse. The trial court also noted that the Defendant was "extremely untruthful." The Tennessee Supreme Court has held that a defendant's lack of candor or untruthfulness reflects poorly on a defendant's potential for rehabilitation and thus supports the denial of probation. See State v. Nunley, 22 S.W.3d 282, 289 (Tenn. Crim. App. 1999); State v. Zeolia, 928 S.W.2d 457, 463 (Tenn. Crim. App. 1996); State v. Neely, 678 S.W.2d 48, 49 (Tenn. 1984).

The trial court applied enhancement factor two,[1] that "[t]he defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range." Tenn. Code Ann. § 40-35-114(2) Supp. 2002. The court stated that the Defendant "had all sorts of traffic convictions, driving related convictions, drinking related things, [and] drug related things." The trial court next applied enhancement factor nine, that "[t]he defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release in the community." Id. § 40-35-114(9). The trial court noted that the Defendant had "a string of convictions" where he got probation and yet continued to break the law. Finally, the trial court applied enhancement factor eleven, that "[t]he defendant had no hesitation about committing a crime when the risk to human life was high." Id. § 40-35-114(11). In applying this factor, the court stated that two individuals testified that they were in vehicles and witnessed the Defendant's "erratic driving." Thus, the trial court stated that other people were at risk on the night of the offense. The Defendant does not challenge the trial court's application of the enhancement factors, and we find no error in the application of these factors by the trial court.

The trial court placed great weight on all of the enhancement factors and did not apply any mitigating factors. The court then sentenced the Defendant to four years for the vehicular assault conviction and to six months for driving on a revoked license. The court further found that the Defendant was not an appropriate candidate for full probation given "the facts and circumstances of this particular case, his previous actions, his character, whether he might be expected to be rehabilitated." The court also noted that the Defendant "had some opportunities in the past and hasn't really done very well on probation." It ordered the Defendant to serve one year of the sentence for vehicular assault in the county jail, to perform one hundred hours of community service work, and to try to get into an alcohol treatment program such as Cadas. The trial court further ordered that the Defendant serve 120 days in the county jail concurrent to his other sentence. After a careful review, we conclude that the record supports the sentence imposed and that the presumption of alternative sentencing was sufficiently rebutted in this case.

Accordingly, the judgments of the trial court is AFFIRMED.

_____
ROBERT W. WEDEMEYER, JUDGE

---

[1] We note that in 2002, the list of statutory enhancement factors to be used in sentencing was amended. See Tenn. Code Ann. § 40-35-114 (Supp. 2002). Therefore, the enhancement factor numbers used by the trial court in sentencing the Defendant differ from those now in use. However, the substance of the enhancement factors applied in this case was not changed by the 2002 amendment.