IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
May 2, 2018 Session

## STATE OF TENNESSEE v. MARLON BOYD

**Appeal from the Criminal Court for Shelby County**
**No. 16-00582          Lee V. Coffee, Judge**

———————————————————

**No. W2017-00791-CCA-R3-CD**

———————————————————

Defendant, Marlon Boyd, was convicted of first degree murder, aggravated assault, and possession of a firearm by a convicted felon. The trial court imposed a total effective sentence of life without parole plus 30 years. On appeal, Defendant argues (1) that the trial court erred in denying his motion to sever the count of the indictment alleging possession of a firearm by a convicted felon from the other charges; (2) that the trial court abused its discretion in allowing the State to use Defendant's prior convictions for impeachment purposes; and (3) that the evidence is insufficient to support his convictions. Upon our review of the record, we find no reversible error and affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which ALAN E. GLENN and J. ROSS DYER, JJ., joined.

Stephen Bush, District Public Defender; Harry E. Sayle III (on appeal), Trent Hall and Jim Hale (at trial), Assistant Public Defenders, for the appellant, Marlon Boyd.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Alanda Dwyer and Stephen Ragland, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

*Factual and Procedural Background*

Defendant was indicted by the Shelby County Grand Jury for first degree murder, aggravated assault, and possession of a firearm by a convicted felon. Prior to trial, Defendant filed a motion to sever Count Three of the indictment, which alleged possession of a firearm by a convicted felon, from the other counts of the indictment. The trial court denied the motion for severance but accepted the parties' stipulation that Defendant had been convicted of felonies involving the use or attempted use of violence.

At trial, Officer Reginald Kelley of the Memphis Police Department testified that he responded to a "shots fired" call on Preston Street between 11:45 p.m. and midnight on May 23, 2014. Officer Kelley discovered the victim, Michael Richard, lying in the street motionless. No one else was around, and there were no weapons or shell casings near the victim. Officers canvassed the neighborhood, and while several people reported hearing a gunshot, including the woman who had called 9-1-1, no one reported having seen what happened.

The medical examiner, Dr. Erica Curry, performed an autopsy on the victim. The victim died from a gunshot wound to the left side of his chest. The bullet struck the victim's ribs, lungs, and aorta, causing a massive amount of internal bleeding. There was no exit wound, and Dr. Curry was able to recover a bullet and several fragments from the victim's body. Based on the soot and lack of stippling around the entrance wound, Dr. Curry estimated that the gun was more than three feet away from the victim when it was fired. Dr. Curry also noted an abrasion on the victim's back as well as scrapes on his ear, elbow, and forearm, which were consistent with the victim's falling after having been shot. The victim's toxicology exam was negative for drugs but revealed a blood alcohol content of .3, over three times the legal limit to drive.

Carlos Lee testified that he lived on Preston Street with his girlfriend and three children. Mr. Lee testified that he was Defendant's first cousin and that several of their family members also lived on Preston Street. Defendant's mother lived just around the corner from Preston Street, and Defendant was on Preston Street almost every day even though he did not live there himself. Mr. Lee lived three houses down from the victim, and they had been neighbors for about three or four years.

On Friday, May 23, 2014, Mr. Lee came home from work around 3:00 p.m. and saw Defendant on the street. Mr. Lee spent the rest of the afternoon running errands. That evening, Mr. Lee joined several people, including Defendant and the victim, "drinking [and] hanging out" on the street in front of Mr. Lee's uncle's house, which was next door to the victim's house. Mr. Lee drank some beer but denied that he was intoxicated. Mr. Lee recalled the victim's going back and forth between his house and the gathering on the street.

Sometime after 11:00 p.m., after several others had left the street gathering, Mr. Lee drove his car back down the street to his house. He parked the car on the street and started up the steps toward his house. The area was well-lit by the streetlights. Mr. Lee saw Defendant walking down the street alone in the direction of Mr. Lee's house. Mr. Lee then saw the victim walking down a hill from the victim's house at an angle. When the victim caught up with Defendant, the two had a conversation while standing in the street in front of Mr. Lee's driveway. Mr. Lee could not hear what the men were talking about, but he denied that it sounded like an argument. Instead, he characterized it as "drunk talk" and testified that both the victim and Defendant seemed intoxicated.

As Mr. Lee continued up the steps to his house, he heard a gunshot. Mr. Lee turned around and saw Defendant standing over the victim pointing what appeared to be a revolver at him. Mr. Lee heard Defendant tell the victim, "Die, bitch!" The victim was lying motionless on the ground, and Mr. Lee believed that he was dead. Defendant then pointed the gun at Mr. Lee and said, "If you say something, I'm going to kill you, too." Mr. Lee testified that he was "scared to death." Mr. Lee went into his house as Defendant walked up the street.

Mr. Lee did not call the police and did not tell the police who were canvassing the neighborhood that night what he saw because he was scared. However, Sergeant Eric Kelly came to his house later the next day, and Mr. Lee eventually told him what happened. Sergeant Kelly described Mr. Lee as extremely nervous and "deathly frightened" that Defendant would follow through on his threat. Mr. Lee identified Defendant in a photospread and provided a written statement. Mr. Lee testified that he had not seen Defendant with a gun earlier that evening at the street gathering but that he had seen Defendant carrying a gun in the past. Mr. Lee subsequently moved away from that neighborhood because he was terrified for the safety of himself, his girlfriend, and his children.

Sergeant Kelly prepared an arrest warrant for Defendant and determined that he might be located at the apartment of his girlfriend, Jaqueline Benson, about one mile from the crime scene. Late Sunday morning, May 25, 2014, Sergeant Kelly and a team of other officers arrived at the apartment to serve the arrest warrant. Sergeant Kelly could hear a television and people talking inside the apartment. Sergeant Kelly knocked on the door and announced "police." After he knocked, Sergeant Kelly heard "a loud thump, like . . . someone large was moving through the apartment, and [he] hear[d] a door close." The front door of the apartment was opened by Ms. Benson. Ms. Benson's brother, Derrick Watts, and several children were also inside the apartment. Ms. Benson told the officers that Defendant was there and that he had gone to one of the back bedrooms. After everyone else had exited the apartment, Sergeant Kelly yelled for

Defendant to come out for several minutes. Defendant eventually came out of the bedroom with his hands in the air and was arrested without incident.

Sergeant Kelly spoke to Ms. Benson and determined that she was the leaseholder of the apartment. Ms. Benson told Sergeant Kelly that Defendant always had a gun and that she knew it was a .357 caliber revolver. Sergeant Kelly obtained consent to search the apartment from Ms. Benson. The room that Defendant had been in was set up as a music room and contained recording equipment, men's clothing, and several beer cans strewn about. Sergeant Kelly did not recall seeing any children's clothing, cosmetics, or perfume in the room, though he did see a lady's handbag hanging on the closet door. Inside the closet under a pile of clothing, the police found two guns. One was a Ruger .357 Magnum revolver with six live .38 caliber rounds and the other was a Smith & Wesson .38 caliber revolver with five live rounds and one spent casing at the "12:00 position," which is at the top by the firing pin.

Ms. Benson testified that she lived in the apartment with Defendant and her three teenaged children. Ms. Benson and Defendant had been together for about five years, and Defendant used to live on Preston Street before he moved in with her. However, Defendant would stay at the apartment for only a few days at a time and then would often be gone for several days. Ms. Benson characterized the room containing the music equipment as "Marlon's room" and explained that no one else was allowed to go into that room. However, Ms. Benson admitted that she did keep a few clothes and toiletries in that room and shared the closet. The children all shared the second bedroom, and Ms. Benson usually slept in the living room.

Ms. Benson recalled that on Friday, May 23, 2014, she arrived home around 10:00 p.m. and that Defendant did not arrive home until around 1:00 a.m. Ms. Benson testified that sometime after this incident, someone called her and told her to say that Defendant was with her at the time the victim was killed. However, Ms. Benson stated that Defendant was not with her and that she was not going to lie for anyone.

On Sunday, May 25, 2014, Mr. Watts came over to his sister's apartment with his young daughter to have her hair braided by a neighbor. Ms. Benson sat on the couch drinking a beer with her brother and Defendant. Mr. Watts's daughter was in the bedroom shared by Ms. Benson's children where Ms. Benson's daughter, Nadaizha Watts, was asleep. No one went into the room with the music equipment. When the police knocked, Defendant got up from the couch quickly and went to the back bedroom. Everyone came out of apartment when told to by the police except for Defendant.

Ms. Benson knew that Defendant carried a gun since she had met him. She knew his gun to be a .357 revolver and that he kept it on his hip or in a dresser. Ms. Benson

had never seen the other revolver found in the closet. Nadaizha Watts testified that she had seen a gun handle poking out of Defendant's pants on his hip "all the time." Mr. Watts also testified that he had often seen Defendant with a black revolver. Mr. Watts, who did not tell the police about his felony theft conviction, denied owning or being around any guns and denied going into the back bedroom. Mr. Watts, Ms. Benson, and Nadaizha Watts all went to the police station together to give statements, though they denied discussing the incident on the way there.

The guns recovered from the closet as well as the bullet and fragments recovered from the victim's body were sent to the Tennessee Bureau of Investigation. No fingerprints were found on either gun. Special Agent Cervinia Braswell, a firearms examiner, testified that the .357 caliber revolver was in non-operating condition due to a bent extractor, the rod upon which the cylinder spins. The .38 caliber revolver was in working condition. Agent Braswell explained that a .357 caliber gun can fire .38 caliber bullets. Agent Braswell testified that the bullet recovered from the victim was consistent with either a .38 or .357 caliber bullet based on its weight. Agent Braswell examined the class characteristics of the bullet and determined that it was not consistent with the .357 caliber revolver but was consistent with the .38 caliber revolver. However, Agent Braswell was unable to determine if the bullet was fired by the .38 caliber revolver recovered in this case because the bullet was too damaged and the gun did not produce enough individual characteristics.

At the conclusion of the State's proof, the jury went to the scene on Preston Street. As discussed further below, the trial court determined during a jury-out hearing that if Defendant were to testify and credibility were to become an issue, then his prior convictions for second degree murder, attempted first degree murder, aggravated assault, and aggravated robbery would become admissible. Defendant elected not to testify or put on any proof. The jury convicted Defendant as charged of the first degree murder of Michael Richard, of the aggravated assault of Carlos Lee, and of possession of a firearm by a convicted felon. After a sentencing hearing, the trial court sentenced Defendant to life without parole as a repeat violent offender pursuant to Tennessee Code Annotated section 40-35-120 for first degree murder, as well as to consecutive sentences of fifteen years each for aggravated assault and possession of a firearm by a convicted felon. After the trial court denied Defendant's motion for a new trial, Defendant filed a timely notice of appeal.

*Analysis*

*I. Sufficiency of the Evidence*

Defendant argues that the evidence adduced at trial is not sufficient for a rational trier of fact to find him guilty of premeditated first degree murder beyond a reasonable doubt.[1] Defendant contends that the State failed to prove that he acted with premeditation because Mr. Lee "did not see the actual shooting" or the interaction between the victim and Defendant "immediately prior to the fatal shot." Additionally, Defendant contends that "there was no dispositive connection between the .38 revolver found at the home of Ms. Jacqueline Benson and the .38 revolver that fired the bullet recovered from the body of [the victim]." The State responds that "[t]he evidence strongly supports the jury's determination that the [D]efendant killed the victim, acting with intent and premeditation." We agree with the State.

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. The jury's verdict replaces the presumption of innocence with one of guilt; therefore, the burden is shifted onto the defendant to show that the evidence introduced at trial was insufficient to support such a verdict. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). The relevant question is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Questions concerning the "'credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact.'" *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008)). The prosecution is entitled to the "'strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom.'" *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). "'A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory.'" *Reid*, 91 S.W.3d at 277 (quoting *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997)). It is not the role of this Court to reweigh or reevaluate the evidence, nor to substitute our own inferences for those drawn from the evidence by the trier of fact. *Id.* The standard of review is the same whether the conviction is based upon direct evidence, circumstantial evidence, or a combination of the two. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009).

First degree murder is the premeditated and intentional killing of another person. T.C.A. § 39-13-202(a)(1). A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." T.C.A. § 39-11-

---

[1] Defendant does not challenge the sufficiency of the evidence supporting his convictions for aggravated assault or possession of a firearm by a convicted felon.

106(a)(18). Premeditation is defined as "an act done after the exercise of reflection and judgment." *Id.* § 39-13-202(d). This section further defines premeditation as follows:

> "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.*

The State must establish the element of premeditation beyond a reasonable doubt. *See State v. Sims*, 45 S.W.3d 1, 7 (Tenn. 2001); *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999). Premeditation may be proved by circumstantial evidence. *See, e.g.*, *State v. Brown*, 836 S.W.2d 530, 541-42 (Tenn. 1992). The existence of premeditation is a question of fact for the jury and may be inferred from the circumstances surrounding the killing. *State v. Young*, 196 S.W.3d 85, 108 (Tenn. 2006); *State v. Suttles*, 30 S.W.3d 252, 261 (Tenn. 2000). Such circumstances include, but are not limited to, the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, the infliction of multiple wounds, threats or declarations of an intent to kill, a lack of provocation by the victim, failure to aid or assist the victim, the procurement of a weapon, preparations before the killing for concealment of the crime, destruction and secretion of evidence of the killing, and calmness immediately after the killing. *State v. Kiser*, 284 S.W.3d 227, 268 (Tenn. 2009); *State v. Leach*, 148 S.W.3d 42, 53-54 (Tenn. 2004); *State v. Davidson*, 121 S.W.3d 600, 615 (Tenn. 2003); *Bland*, 958 S.W.2d at 660.

In the light most favorable to the State, the evidence shows that Defendant shot and killed Michael Richard in the street in front of Carlos Lee's house. Even though Mr. Lee did not actually see Defendant pull the trigger, he saw the victim and Defendant engage in a conversation, heard a gunshot while his back was briefly turned, and saw Defendant standing over the victim's motionless body while pointing a revolver and saying, "Die, bitch!" Defendant then turned the revolver on Mr. Lee and threatened to kill him if he told anyone what happened. Defendant's statements can be seen as a declaration of an intent to kill, supporting the jury's finding of premeditation. From Mr. Lee's description of the victim's and Defendant's conversation as "drunk talk" rather than an argument, the jury could find that Defendant acted unprovoked by the victim. No weapons were found around the victim's body, supporting a finding that Defendant used a deadly weapon against an unarmed victim. Additionally, when the police later went to arrest Defendant at Ms. Benson's apartment, he reluctantly came out of a back bedroom where two revolvers were hidden under a pile of clothes, one of which bore similar class

characteristics to the bullet recovered from the victim's body. The destruction or secretion of evidence also supports a finding of premeditation. The fact that the bullet could not be more definitively linked to the recovered revolver is inconsequential given the circumstantial evidence that Defendant used a revolver of that caliber to shoot the victim. The evidence overwhelmingly supports the jury's verdict that Defendant was guilty of first degree murder, as well as aggravated assault and possession of a firearm by a convicted felon.

## II. Motion to Sever

Defendant argues that the trial court erred in denying his motion to sever Count Three of the indictment, which charged possession of a firearm by a convicted felon, from the other counts of the indictment. A trial court's decision to join or sever offenses is reviewed on appeal for an abuse of discretion. *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999). A trial court's denial of a motion to sever offenses will be reversed on appeal only when the trial court "applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." *Id*. (quoting *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn. 1997)); *see also State v. Goodwin*, 143 S.W.3d 771, 780 (Tenn. 2004).

Joinder of offenses may either be mandatory or permissive. *See* Tenn. R. Crim. P. 8(a), (b). "Two or more offenses must be joined or consolidated if (1) the offenses arise from the same conduct or criminal episode; (2) the conduct is known to the appropriate prosecuting official at the time of the return of the indictment; and (3) the offenses fall within the jurisdiction of a single court." *State v. Baird*, 88 S.W.3d 617, 620 (Tenn. Crim. App. 2001) (citing Tenn. R. Crim. P. 8(a)). Offenses are part of the "same conduct" when "a single act . . . results in a number of interrelated offenses." *State v. Johnson*, 342 S.W.3d 468, 473 (Tenn. 2011). Offenses are part of the "same criminal episode" when they "occur simultaneously or in close sequence," "occur in the same place or in closely situated places," and "proof of one offense necessarily involves proof of the others." *Id.* at 475 (internal quotations and citations omitted). The Advisory Commission Comments to Tennessee Rule of Criminal Procedure 8 provide:

> This rule is designed to encourage the disposition in a single trial of multiple offenses arising from the same conduct and from the same criminal episode, and should therefore promote efficiency and economy. Where such joinder of offenses might give rise to an injustice, Rule 14(b)(2) allows the trial court to relax the rule.

Rule 14 allows a trial court to sever mandatorily joined offenses before trial if appropriate to promote a fair determination of the defendant's guilt or innocence. *See* Tenn. R. Crim. P. 14(b)(2)(A).

Prior to trial, Defendant filed a motion to sever Count Three of the indictment, which charged possession of a firearm by a convicted felon, from the remaining counts. Defendant argued that the recitation of his prior convictions for violent felonies would predispose the jury to finding him guilty based upon propensity. Defendant asserted that the offenses did not qualify for mandatory joinder because his possession of the revolvers at the time of his arrest was not part of the same conduct or criminal episode as the murder and assault thirty-six hours earlier. Defendant relies on the Tennessee Supreme Court's opinion in *Johnson*, which held that mandatory joinder did not apply to the offenses of aggravated robbery and filing a false police report that occurred twelve hours apart. *See Johnson*, 342 S.W.3d at 476. However, Count Three did not merely allege Defendant's possession of the revolvers at the time that he was arrested. The indictment indicates that the possession occurred "between May 22, 2014 and May 25, 2014," embracing both the date of the arrest and the date of the shooting. Defendant's possession of a firearm constitutes part of the same conduct or criminal episode as the other counts in the indictment because he necessarily had to possess a firearm in order to shoot Mr. Richard and threaten Mr. Lee with it. Therefore, the trial court was correct in determining that these offenses were mandatorily joined under Rule 8(a).

As to Defendant's assertion that the recitation of his prior convictions as listed in Count Three would unfairly prejudice the jury, the trial court allowed Defendant to stipulate that he had been convicted of felonies involving the use or attempted use of violence without specifically enumerating those felonies. Additionally, the trial court instructed the jury that it may consider the stipulation only as it related to the elements of possession of a firearm by a convicted felon and for no other purpose. On appeal, Defendant argues that this stipulation "did not cure the prejudice to [Defendant's] right to a fair trial." This Court has explained that where joinder of offenses is mandatory, "the relevant inquiry is whether severance of the possession of a [firearm] by a convicted felon charge was necessary 'to promote a fair determination of [Defendant's] guilt or innocence of each offense.'" *State v. Martin Boyce*, No. W2012-00887-CCA-R3-CD, 2013 WL 4027244, at \*12 (Tenn. Crim. App. Aug. 6, 2013), *no perm. app. filed*; *see* Tenn. R. Crim. P. 14(b)(2). As in *Martin Boyce*, the trial court in this case properly instructed the jury, and the jury is presumed to follow the instructions of the court. *See id.* at \*12-13 (citing *State v. Banks*, 271 S.W.3d 90, 134 (Tenn. 2008)). Moreover, the evidence against Defendant was strong, given the uncontroverted eyewitness testimony of Mr. Lee. We conclude that the trial court did not abuse its discretion in denying Defendant's motion to sever Count Three of the indictment.

### III. Impeachment by Prior Convictions

Finally, Defendant argues that the trial court abused its discretion in allowing the State to use Defendant's prior convictions for impeachment purposes. Tennessee Rule of Evidence 609 permits impeachment of a witness, including a defendant, by prior convictions. The conviction must be for a felony or for a crime involving dishonesty or false statement. Tenn. R. Evid. 609(a)(2). Generally, a conviction will not be admissible if more than ten years has passed since the person was released from confinement. Tenn. R. Evid. 609(b). The State must give reasonable written notice prior to trial of any convictions it intends to use against a defendant. Tenn. R. Evid. 609(a)(3). Upon request, the trial court must determine prior to the defendant's testifying whether "the conviction's probative value on credibility outweighs its unfair prejudicial effect on the substantive issues." *Id*. If the court rules that the conviction is admissible to impeach the defendant, the defendant need not testify at trial in order to challenge the court's ruling on appeal. *Id*. On appeal, this Court will review the trial court's determination for an abuse of discretion. *State v. Thompson*, 36 S.W.3d 102, 110 (Tenn. Crim. App. 2000).

In this case, Defendant had prior convictions for second degree murder, attempted first degree murder, aggravated robbery, and aggravated assault, for which he was released from confinement in September 2008, and possession of a handgun by a convicted felon, for which he was released in July 2013. On appeal, Defendant concedes that he received proper notice from the State,[2] that the convictions were for qualifying crimes, and that his release dates were within the ten-year limit. Defendant also concedes that the trial court correctly ruled that his conviction for aggravated robbery was admissible because it was a crime involving dishonesty. *See State v. Blevins*, 968 S.W.2d 888, 893 (Tenn. Crim. App. 1997) (noting that robbery is a crime of dishonesty, "thus lending greater weight to [its] probative value regarding credibility"). Defendant contends, however, that the trial court erred in determining that the probative value of his convictions for second degree murder, attempted first degree murder, and aggravated assault outweighed their potential prejudicial effect.[3]

In determining the admissibility of a conviction as impeachment evidence against a defendant, "[t]wo criteria are especially relevant . . . : (1) the impeaching conviction's relevance as to credibility; and (2) the impeaching conviction's similarity to the charged

---

[2] While there is no written notice in the technical record, the State filed a motion on June 17, 2016, to incorporate motions previously filed under the original indictment into the superseding indictment, including an "impeachment notice" filed on February 15, 2015. The trial court, in ruling on the issue, also found that the State had filed the proper notice.

[3] Defendant does not address the trial court's ruling with regard to his conviction for possession of a handgun by a convicted felon.

offense." *State v. Waller*, 118 S.W.3d 368, 371 (Tenn. 2003) (citing *State v. Mixon*, 983 S.W.2d 661, 674 (Tenn. 1999)). While Rule 609 "suggests that the commission of any felony is 'generally probative' of a criminal defendant's credibility," our supreme court has "rejected a per se rule that permits impeachment by any and all felony convictions." *Id.* (internal citations omitted). "To determine how probative a felony conviction is to the issue of credibility, the trial court must assess whether the felony offense involves dishonesty or false statement." *Id.* (citing *State v. Walker*, 29 S.W.3d 885, 890 (Tenn. Crim. App. 1999)). Crimes of violence may have some probative value as to credibility because they "reflect on the moral character of a witness." *Thompson*, 36 S.W.3d at 111 (quoting *State v. Blanton*, 926 S.W.2d 953, 960 (Tenn. Crim. App. 1996)). However, "the linkage is not as palpable as when the impeaching crime involves deceit or dishonesty." *Id.* at 112. As this Court has previously noted, "'the link between [violent] crime and truthfulness is, at best, weak and the potential prejudice is significant.'" *State v. Garry Baker*, No. M2016-01164-CCA-R3-CD, 2017 WL 1534993, at *10 (Tenn. Crim. App. Apr. 28, 2017) (quoting Neil P. Cohen et al., *Tennessee Law of Evidence* § 6.09[10][c] (6th ed. 2011)), *no perm. app. filed*.

Once the trial court determines the probative value of the impeaching conviction on the issue of the defendant's credibility, "it should next 'assess the similarity between the crime on trial and the crime underlying the impeaching conviction.'" *Waller*, 118 S.W.3d at 373 (quoting *Mixon*, 983 S.W.2d at 674). The potential for unfair prejudice greatly increases when the impeaching conviction is substantially similar to the crime for which the defendant is being tried because "a danger exists that jurors will improperly consider the impeaching conviction as evidence of the propensity of the defendant to commit the crime." *Id.* However, evidence of a substantially similar prior conviction is not per se inadmissible, and a trial court must carefully balance the conviction's probative value as to credibility against its potential prejudicial effect. *Id.* (citing *State v. Galmore*, 994 S.W.2d 120, 122 (Tenn. 1999); *Mixon*, 983 S.W.2d at 674). "[E]vidence of convictions for the same type of crime should be admitted sparingly because of the impression on jurors that if a person committed a crime in the past, he committed the offense for which he is on trial." *State v. Russell*, 382 S.W.3d 312, 317 (Tenn. 2012).

In this case, with regard to Defendant's prior convictions for second degree murder, attempted first degree murder, and aggravated assault, the trial court noted that the "[c]ase law is . . . clear that those crimes that involve violence or are of an assaultive nature generally have little or no bearing on honesty or veracity, and that those cases are not necessarily admissible for impeachment purposes." However, the trial court found that if Defendant testified, his credibility would almost certainly be at issue and determined that "if the issue in this case becomes strictly of credibility, this [c]ourt will find that the probative value of those convictions are [sic] not outweighed." The trial court ruled,

the State of Tennessee would be able to ask [Defendant] about the murder second conviction, the criminal attempt first degree murder, the aggravated assault, and also the convicted felon in possession of a handgun, if the only issue about his testimony does, in fact, become credibility, and the State will be able to impeach [Defendant] on those convictions because the issue of credibility would, in fact, be paramount, and I will find that the probative value of those prior convictions outweighs any unfair prejudicial effect pursuant to *Mixon*, and the issue would not be propensity that those convictions would be allowed to be asked pursuant to [Rule] 609.

The trial court noted that it was "balancing any harmful effect that a jury will be told that [Defendant] has five felony convictions on his record, balancing that with the issue of credibility." The trial court stated that it would instruct the jury that it could only consider the prior convictions for their effect on Defendant's credibility as it had done with Mr. Watts's testimony that he had a prior conviction for felony theft. The trial court clarified that "if [Defendant] is able to take the witness stand and not put his credibility at issue, then the only conviction the State will be able to ask about would be the aggravated robbery."

While the trial court repeatedly stated that the Defendant would almost certainly place his credibility at issue if he testified and that credibility in this case was "paramount," the trial court never explained on the record how Defendant's prior convictions for second degree murder, attempted first degree murder, and aggravated assault were relevant to the issue of credibility other than recognizing that such crimes "generally have little or no bearing on honesty or veracity." Moreover, the trial court did not assess the similarity between the prior convictions and the crimes for which Defendant was on trial in order to determine their potential prejudicial effect. Because Defendant's prior convictions were for crimes of violence, they had some probative value as to credibility, but it was minimal. *See Thompson*, 36 S.W.3d at 111. Additionally, because the prior convictions were identical to the crimes for which Defendant was on trial, the danger that the jurors might erroneously consider the prior convictions as propensity evidence was particularly great. *See Mixon*, 983 S.W.2d at 674. Therefore, the probative value of Defendant's convictions for second degree murder, attempted first degree murder, and aggravated assault did not outweigh their potential unfair prejudicial effect. Thus, the trial court erred in ruling that Defendant's prior convictions for second degree murder, attempted first degree murder, and aggravated assault would be admissible for impeachment purposes.

Next, we must "consider whether the error in this case affirmatively or more probably than not affected the judgment to [the defendant's] prejudice." *Waller*, 118

S.W.3d at 374 (citing Tenn. R. App. P. 36(b); *Galmore*, 994 S.W.2d at 125). When undertaking a harmless error analysis, this Court must consider whether "an error more probably than not had a substantial and injurious impact on the jury's decision-making." *State v. Rodriquez*, 254 S.W.3d 361, 372 (Tenn. 2008). "In assessing the harmlessness of the error, we do not consider whether the defendant would have testified but for the erroneous ruling—nor whether he would have declined to testify had the trial court excluded the murder and aggravated assault convictions but correctly allowed impeachment via the [aggravated robbery] conviction[]." *Thompson*, 36 S.W.3d at 112 (citing *Galmore*, 994 S.W.2d at 124-25). Instead, this Court must examine the "theory of the defense"—gleaned from the arguments of counsel, the evidence presented in the defendant's case-in-chief, and the cross-examination of the State's witnesses—to determine "whether the erroneous impeachment would have had an impact on the result of the trial." *Id.*; *see also State v. Lankford*, 298 S.W.3d 176, 182-83 (Tenn. Crim. App. 2008). While a defendant is not required to make an offer of proof as to what his testimony would be, our supreme court has recognized that, "[d]epending on the facts and circumstances of a case, an offer of proof may be the only way to demonstrate prejudice." *Galmore*, 994 S.W.2d at 125.

In this case, Defendant does not contest his presence on Preston Street or his interaction with the victim as described by Mr. Lee. Instead, Defendant points out in his appellate brief that Mr. Lee did not see the actual shooting and could not hear the substance of Defendant's conversation with the victim. Defendant argues that without his testimony as "the only living witness to the shooting," "[i]t is unknown what happened or what was said immediately prior to the shot—whether Mr. Richard attacked [Defendant] or provoked him sufficiently to qualify for second degree murder or voluntary manslaughter." However, Defendant presented no proof or argument at trial suggesting a self-defense or provocation theory. Even on appeal, Defendant does not actually assert that the substance of his testimony would have been that the victim attacked or provoked him, merely that it is "unknown" whether such happened. This theory of defense on appeal, which seemingly admits Defendant's identity as the shooter, is markedly different from his theory of defense at trial, which focused instead on the fact that neither of the revolvers found in the bedroom in Ms. Benson's apartment could be conclusively identified as the murder weapon, on Defendant's contention that he did not have exclusive control of that bedroom to establish that he possessed those revolvers, and on the State's alleged failure to prove premeditation. Defendant even briefly suggested in closing argument that Mr. Lee could have shot the victim. Thus, without either a proffer of what Defendant's testimony would have been or a clear theory of defense that would render such a proffer a mere "formality," *see Thompson*, 36 S.W.3d at 113, Defendant has failed to prove how he was prejudiced by the trial court's erroneous ruling. Moreover, had Defendant testified, he would have been properly impeached with his conviction for aggravated robbery, and the trial court would have given the jury a

limiting instruction that would have "'provided an adequate safeguard against any potential prejudice possibly engendered by the admission of the prior conviction.'" *See State v. Tarrence Parham*, No. W2009-00709-CCA-R3-CD, 2010 WL 2898785, at \*8-9 (Tenn. Crim. App. July 26, 2010) (quoting *Lankford*, 298 S.W.3d at 182) (finding the erroneous admission of a reckless homicide conviction harmless when the defendant was also impeached by burglary and theft convictions), *perm. app. denied* (Tenn. Nov. 10, 2010). We conclude that the trial court's error in ruling that Defendant's convictions for second degree murder, attempted first degree murder, and aggravated assault would be admissible for impeachment purposes was harmless. Defendant is not entitled to relief.

*Conclusion*

Based on the foregoing, we affirm the judgment of the trial court.

_____
TIMOTHY L. EASTER, JUDGE